**FREEDOM NEWSPAPERS OF TEXAS, et al., Petitioner,**

v.

**Conrado M. CANTU, Respondent.**

No. 04–0115.

Supreme Court of Texas.

Argued Jan. 25, 2005.

Decided June 24, 2005.

Rehearing Denied Sept. 2, 2005.

Jeffery T. Nobles, Beirne, Maynard & Parsons, L.L.P., Houston, John A. Bussian III, The Bussian Law Firm, PLLC, Raleigh, NC, and Brian G. Janis, Sanchez, Whittington, Janis & Zabarte, Brownsville, for petitioner.

Victor Quintanilla, Brownsville, Larry Zinn, Law Office of Larry Zinn, San Antonio, Ernesto Gamez Jr., Law Offices of Ernesto Gamez, Jr., for respondent.

Jorge C. Rangel, Jon D. Brooks, The Rangel Law Firm, P.C., Corpus Christi, Gregory S. Coleman, Weil, Gotshal & Manges, L.L.P., Austin, Thomas S. Leatherbury, Marc A. Fuller, Vinson & Elkins, L.L.P, Dallas, for Amicus Curiae.

Justice BRISTER delivered the opinion of the Court.

The former sheriff of Cameron County, Texas brought suit against *The Brownsville Herald* and two former employees (collectively "the *Herald*")[1] alleging that two articles about a candidate debate shortly before the 2000 election were defamatory. The trial court denied the *Herald's* motions for summary judgment and the court of appeals affirmed.[2] Because we conclude there was no evidence of actual malice, we reverse.

## I

On October 4, 2000, shortly before early voting was to begin in the November 2000 general election, several candidates for local office in Cameron County participated in a debate at the Brownsville Public Library. Among them was respondent Conrado M. Cantu, Democratic candidate for Sheriff, and his Republican opponent, Terry Vinson. Both candidates made speeches and answered questions over the course of approximately thirty minutes.

An audience member recorded the debate. While the transcript of that recording in the summary judgment record is not entirely complete, all parties agree that as far as it goes it accurately represents what the candidates said. During the course of the debate, the following exchanges occurred:

> Cantu: I am sure you [Vinson] are a good instructor, because you were my instructor in the police academy, but the fact still remains that if he was in Los Fresnos as Chief and sincere, why didn't they select him as chief.... [I]t is not

---

1. Defendants/petitioners are Freedom Newspapers of Texas d/b/a *The Brownsville Herald*, former editor George Cox, and former reporter Brad Pierce.

2. 126 S.W.3d 185, 195.

easy to go out there and stand in a neighborhood and tell everybody what are your needs, what are your problems. I can do that because I am bi-cultural, I know the people, I know everybody that lives in my precinct and that is why I have been honored by everybody because of my dedication.

\* \* \*

Cantu: I have been honored like I said by the school district, by the county and other entities because of my dedication and it is going to be very, very important when you go out to vote on November 7, you are going to vote for somebody that really cares, who comes from the heart, and want to do a great job for every taxpayer of this county. It is not easy, it is not an easy job. Mr. Vinson is a nice man, but he is an instructor, he is not a sheriff. You have to have the right character to be a sheriff and you have to delegate authority and it does not stop there. You have to be bi-cultural to understand what is going on in our neighborhoods, where there is a lot of burglaries, how are you going to relate to these people—in Spanish—and make them understand that they need to stop or we are going to put a stop to it in their neighborhoods. How is it going to happen? You have to be able to understand, you have to have grown up here to understand that.

Vinson: Well, when he brings up the bi-cultural, well he is forgetting we have orientals, we have Filipinos, we have Chinese, we got Japanese, we got Chinese, we've got ... Israelis, we have ... what is he going to talk to them, you are going to find somebody to do the communicating for you. I have worked the streets in Cameron County for over 13 years, 14 years on the street, I have never called anybody ... because he is unable to communicate one way or another. He didn't take ... in the area, I mean, all you got to do is take a report and say what can we do as being ... not what I can do, what can we do, the people and myself as sheriff. What can we do as a team itself, that's what we need to do. Bi-cultural is a barrier that is there because people put it there, it shouldn't exist. I don't believe in it. I believe everybody is the same, everybody is treated the same and everybody should be shown the respect. . . .

\* \* \*

Vinson: I am not going to tolerate the compadreism, I am sorry, I am not from this culture, I apologize to that [sic], but I can guarantee you one thing, I will treat everybody the same. . . .

The *Herald* assigned Brad Pierce to report on the debate. He took notes, but did not record it. The next morning, his article appeared on the front page of the newspaper, under a headline added by the copy desk editor:

### Cantu: No Anglo can be sheriff of Cameron County

**Election 2000:** Dem candidate stresses Hispanic heritage at debate

No Anglo could ever be sheriff of Cameron County, Conrado Cantu said Wednesday during a debate with his opponent Terry Vinson in the race for the county's top law enforcement office.

"How are you going to relate to these people?" Cantu asked Vinson, stressing that he's up for the job because he's Hispanic and knows the residents.

Cantu repeatedly said he's the better candidate because he's bi-cultural.

"Bi-cultural is a barrier that's there because people put it there," Vinson re-

plied. "We have a large culture," but "I believe everyone is the same."

The two sheriff candidates squared off for more than 30 minutes at the public library Wednesday in debates sponsored by South Texans for Good Government. When asked about investigations of criminal misconduct currently focusing on him, Cantu became visibly upset, said he thought he had come to debate the issues and blamed Vinson for trying to "trick" him.

"I have never done anything wrong," Cantu said. "I'm still going to work hard and win this campaign."

Cantu defended his qualifications for the job, saying that while he might have only 32 years experience in law enforcement, he's learned a lot in that time. "If you don't work among the people that count, what good is (experience)?" Cantu said. "I have the desire and energy to be the next sheriff of the county," and that is more important than experience.

"It takes a man who is dedicated to his job and in fulfilling his goals," he said. "I will work hard to represent you and I know I won't let you down."

Vinson, standing on his record of more than two decades in law enforcement and his extensive instruction in training officers, said that while he's not suggesting Cantu is not qualified, he is a "rookie" officer.

"I've done my time. I'm ready to get to work," Vinson said. "I have the ability to manage personnel. I know what officers need to do. We all have differences, Y but the issues are who can do the job."

Vinson said he wants to reorganize the sheriff's department, build on Sheriff Omar Lucio's programs and focus on training deputies. He said he won't to-lerate compadreism and wants to instill honesty and accountability to the office. Cantu wants to build a better relationship with the constables' offices and beef up patrols in neighborhoods.

"There's a lot of burglaries going on in this county and for a while nothing's been done about it," Cantu said. Vinson agreed that burglary is an important issue to address, but "we've got to get the drugs out of the community and I'm the man who can do that."

The article concluded with reports of debates between other local candidates.

The morning the article appeared, George Cox, then the editor of the newspaper, spoke with Pierce about the article. Pierce told Cox that Cantu had not used the word "Anglo," but that the substance of the article was accurate.

That same morning, Cantu came to the *Herald* offices and told Cox that he objected to the use of the word "Anglo" in the article. He brought an audiotape of the debate, which Cox declined to review. But Cox did agree to publish a follow-up article, and had Cantu meet with Pierce for an interview to present his side of what occurred.

The next day, October 6, 2000, a second article appeared concerning the debate. That article stated in its entirety:

### Sheriff candidate says racial issue wasn't the point

**Election:** Cantu says Valley needs bi-cultural candidates

Constable Conrado Cantu said he wants to set the record straight on comments that he made this week about his opponent in the Cameron County sheriff's race not being the best man for the job because he's not Hispanic.

Democrat Cantu said he never intended to suggest that race is an issue in his

campaign, but that he has an advantage over Republican Terry Vinson because he is from the Rio Grande Valley, speaks Spanish and understands the needs of the majority of the public.

"The people of the Rio Grande Valley live in a bi-cultural area," Cantu said, explaining that because he is "bi-cultural," he is the best candidate to represent citizens as Cameron County's top law enforcement officer.

Cantu was speaking at the South Texan for Good Government debates on Wednesday when he made what some observers believe were discriminating remarks against Vinson. However, Chris Patterson, a youth basketball coach and Cantu supporter, said he believes the constable was simply misunderstood.

"I didn't hear it that way. I don't think it was a bad intent. He was talking about bi-cultural," Patterson said. Claiming that he said no Anglo could ever be sheriff "wasn't a fair representation" of Cantu's comments, Patterson added, "and its [sic] definitely not what he stands for."

However, Vinson maintains that Cantu's statements that he cannot connect with Hispanics just because he's not native to the Valley are inappropriate.

"It was my impression that because of my heritage, I was incapable of communicating or relating with the Hispanic culture," Vinson said. "What is that, if it's not a racial statement? He was singling me out and that was wrong, I was quite offended."

In a county that's more than 90 percent Hispanic, "he does have a point," independent voter Henry Gonzalez said, "but they're all kinds of people in the Valley, not just Hispanics."

Cantu said some of his strengths are the fact that he grew up in South Texas and can relate to the problems of all people, regardless of whether they live in Cameron Park or Valley International Country Club.

"I did not say that an Anglo could not be sheriff," he said, but rather that, by being bi-cultural, he has a better opportunity to resolve conflicts and protect neighborhoods.

However, Tracy Larimore, who said he was leaning toward voting for Cantu until Wednesday night, said, "Does that mean that he can understand the Anglo race, and if that's so, how come Vinson can't understand the Hispanic race?

"I clearly heard that the only person who could be sheriff is an Hispanic," Larimore said. "Frankly, I think he was caught off guard. I think he meant what he said and now he's taking flack over it. He would have been far better not saying a word."

However, Patterson said anyone who knows Cantu is sure that he would never say anything discriminatory. He's only known the constable for a short while, but finds him to be a generous, caring person who's deeply interested in the well being of the county's youth.

In Wednesday's debates, Cantu talked about his energy and passion for the job while Vinson cited his experience and knowledge of the office.

Cantu ultimately won the election. Nine months after taking office, he sued the *Herald* for defamation.[3] The *Herald* filed

3. Cantu's First Amended Petition includes multifarious subtitles, including libel, slander, defamation of character, damage to reputation, intentional infliction of emotional distress, and publications made with actual malice. But he does not argue that any of these claims can be asserted against the *Herald* absent some evidence of actual malice. See, e.g., *Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (hold-

motions for summary judgment, which the trial court denied. The *Herald* filed an interlocutory appeal,[4] and the Thirteenth Court of Appeals affirmed.[5] We granted the *Herald's* petition for review.[6]

## II

### A

To recover for defamation, a public official like Cantu must prove that the *Herald* published a false and defamatory statement with actual malice.[7] At the summary judgment stage, the *Herald* can negate actual malice as a matter of law by proving that it did not publish the articles at issue with knowledge of falsity or reckless disregard for the truth.[8]

The *Herald's* motions for summary judgment included affidavits from its publisher, copy desk editor, Pierce, and Cox, each averring he had no knowledge of any inaccuracies in the articles before publication or any reason to doubt their accuracy. Neither Cantu nor the court of appeals suggest these affidavits were insufficient to meet the applicable summary judgment standards.[9]

Jurors of course would not be required to accept the truth of these affidavits.[10] But the possibility that a jury might disbelieve them is not evidence supporting the contrary.[11] The *Herald* having produced some evidence that it acted without malice, the burden shifted to Cantu to produce some contrary evidence to avoid summary judgment.[12]

The court of appeals held that Cantu had done so, pointing to circumstantial evidence suggesting actual malice.[13] To that evidence we now turn.

---

ing Constitution prohibits intentional infliction claim absent actual malice). Accordingly, to the extent his pleadings allege claims other then defamation, they must stand or fall with his defamation claim.

**4.** *See* Tex. Civ. Prac. & Rem.Code § 51.014(a)(6).

**5.** 126 S.W.3d at 195.

**6.** *See* Tex. Gov't Code § 22.225(d).

**7.** *Hearst Corp. v. Skeen,* 159 S.W.3d 633, 636–37 (Tex.2005) (per curiam); *Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 420 (Tex. 2000).

**8.** *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 162 (Tex.2004); *Huckabee,* 19 S.W.3d at 420; *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 574 (Tex.1998); *Casso v. Brand,* 776 S.W.2d 551, 559 (Tex.1989).

**9.** *See* Tex.R. Civ. P. 166a(c) (allowing summary judgment based on testimony of interested witnesses if "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted"); *New Times,* 146 S.W.3d at 163–65.

**10.** *See, e.g., Bentley v. Bunton,* 94 S.W.3d 561, 596 (Tex.2002) (holding defendant's testimony "that he believed what he said is not conclusive, irrespective of all other evidence").

**11.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 124–25 (Tex.2000) ("It is not enough for the jury to disbelieve defendant's testimony. Rather the plaintiff must offer clear and convincing affirmative proof to support a recovery.") (citing *Casso,* 776 S.W.2d at 558).

**12.** *Skeen,* 159 S.W.3d at 637; *Huckabee,* 19 S.W.3d at 424.

**13.** *Bentley,* 94 S.W.3d at 596 ("The defendant's state of mind can—indeed, must usually—be proved by circumstantial evidence.").

## B

From the day the articles appeared through oral arguments in this Court, Cantu's primary complaint is that he never used the words attributed to him by the *Herald* in its initial headline and first sentence. The *Herald* concedes this is true. The court of appeals concluded this was some evidence of malice, as "Pierce attended the debate and heard the candidate's comments, and knew that Cantu did not say that 'No Anglo can be sheriff of Cameron County.' "[14]

But unlike the court of appeals, the *Herald* did not put this last phrase in quotation marks. While some of Cantu's statements at the debate were placed in quotation marks, this one was not. Cantu discounts this distinction, arguing the colon used in the headline is the "equivalent" of quotation marks.

In *Masson v. New Yorker Magazine, Inc.*, the United States Supreme Court held that placing a reporter's words in a speaker's mouth may be evidence of malice in some circumstances.[15] As the Court noted:

In general, quotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim. They inform the reader that he or she is reading the statement of the speaker, not a paraphrase or other indirect interpretation by an author.[16]

But the Court rejected the notion that every alteration of a speaker's words was some evidence of actual malice.[17] The Court noted that reporters who rely on notes must often reconstruct a speaker's statements, and even those who rely on recordings can print statements verbatim "in only rare circumstances" due to space limitations and editorial judgments.[18]

Instead, the Court held that an altered statement could constitute some evidence of actual malice if a reasonable reader could understand the passage as the speaker's actual words (not a paraphrase), and the alteration was material.[19] As we recently noted, the reasonable-reader standard is objective rather than subjective, and presumes a hypothetical reader of ordinary intelligence who reads an entire article in context.[20]

In this case, three rather apparent clues would lead a reasonable reader to conclude the *Herald* was interpreting Cantu's remarks rather than quoting them verbatim. First, such a reader would note that quotation marks were placed around eight of Cantu's statements in the first article, but not the one at issue.

Second, a reasonable reader could not miss the pattern of the articles, in which a summary of what each candidate said appears in one paragraph (for example, the 1st, 6th, 8th, 11th, and 14th paragraphs of the initial article) followed by one or two paragraphs of explicit quotations to support the summary. In this context, a reasonable reader would understand the first headline and sentence to be a paraphrase of Cantu's remarks, with his actual statements following in quotations.

Finally, while both articles were allegedly defamatory, the *Herald's* second article

---

14. 126 S.W.3d at 194.

15. 501 U.S. 496, 519–20, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

16. *Id.* at 511, 111 S.Ct. 2419.

17. *Id.* at 514, 111 S.Ct. 2419.

18. *Id.* at 515, 111 S.Ct. 2419.

19. *Id.* at 512–13, 515–17, 521–25, 111 S.Ct. 2419.

20. *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157–59 (Tex.2004).

reported Cantu's response that "I did not say that an Anglo could not be sheriff." Nothing in the follow-up article contradicts that claim. To the contrary, the report that "some observers believe" Cantu had made "discriminating remarks" at the debate clarified that the issue was the implicit rather than explicit meaning of what he said.

Based on the entire context of the articles Cantu claims were defamatory, we hold that a reasonable reader would have understood the *Herald's* reports to be a paraphrase or interpretation of Cantu's remarks. Accordingly, proof that he did not make the exact remark attributed to him, standing alone, is no evidence of actual malice.

### C

■ Of course, deliberately attributing a statement to a public figure that the latter never made may be defamatory whether or not it is in quotation marks. But "a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of *New York Times Co. v. Sullivan* and *Gertz v. Robert Welch, Inc.,* unless the alteration results in a material change in the meaning conveyed by the statement." [21]

Cantu argues that the *Herald* made a deliberate and material change in meaning when it converted his remarks about his bilingual and bicultural attributes into remarks about racial and ethnic ones. For summary judgment purposes, we assume the truth of Cantu's assertion that he intended only the former. Further, we agree with Cantu that reasonable jurors could conclude from the *Herald's* report that he was accused of intending the latter, and that the difference between the two is material.

■ But evidence that the *Herald's* report was mistaken, even negligently so, is no evidence of actual malice.[22] Cantu must present some evidence that the *Herald* misinterpreted his remarks on purpose, or in circumstances so improbable that only a reckless publisher would have made the mistake.[23] "An understandable misinterpretation of ambiguous facts does not show actual malice." [24]

In *Time, Inc. v. Pape,* the Supreme Court addressed a similar defamation claim in which the words of a source were undisputed but their meaning was ambiguous.[25] In that case, a report on police brutality by the U.S. Commission on Civil Rights cited allegations from a civil lawsuit asserting misconduct by Chicago police.[26] In its article on the Commission's report, *Time* magazine stated the allegations as fact, omitting the word "alleged" that appeared in the report.[27]

**21.** *Masson,* 501 U.S. at 517, 111 S.Ct. 2419 (1991) (citations omitted).

**22.** *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000) ("A publisher's presentation of facts may be misleading, even negligently so, but is not a 'calculated falsehood' unless the publisher knows or strongly suspects that it is misleading.").

**23.** *Bentley v. Bunton,* 94 S.W.3d 561, 596 (Tex.2002) (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 290, 84 S.Ct. 710, 732, 11 L.Ed.2d 686 (1964)).

**24.** *Id.*

**25.** 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).

**26.** *Id.* at 280–81, 91 S.Ct. 633.

**27.** *Id.* at 282–83, 91 S.Ct. 633.

But while the Commission's report did list the incident as "alleged," in fact the report was "extravagantly ambiguous" about whether the allegations were true.[28] The Commission summarized the contents of the report as "the alleged facts of 11 typical cases of police brutality," [29] though of course none could be "typical cases" of brutality unless they were true. While the report stated that the truth of each incident was a matter for the courts, the Commission cited no other evidence of brutality to support the changes it recommended.[30] In this context, the Supreme Court held that reporting the Chicago incident as factual was a rational interpretation of what the Commission's report impliedly said:

> Time's omission of the word "alleged" amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under New York Times. To permit the malice issue to go to the jury because of the omission of a word like "alleged," despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on errors of historic fact.[31]

In this case, Cantu's remarks at the debate also "bristled with ambiguities." Cantu argues that his comments had nothing to do with race, as anyone can be both bilingual and bicultural. But the context here was a debate in which Cantu was distinguishing himself from his opponent. Cantu conceded at his deposition that he knew his opponent was not Hispanic, but did not know whether he spoke Spanish; at the least, this might suggest he was using "bilingual" to indicate the former rather than latter. And Cantu does not explain why his opponent was not "bicultural," despite claiming many more years of experience in law enforcement in the Rio Grande Valley than Cantu.

It is apparent from his response that Cantu's opponent certainly thought the remarks had something to do with race or ethnicity. While an opponent's interpretation cannot make Cantu's remarks ambiguous, it is noteworthy that Cantu never corrected his opponent's misinterpretation during the remainder of their debate.

Similarly ambiguous is Cantu's explanation from the day after the debate until now that he was merely referring to place of birth, native language, and understanding for "the needs of the majority." While place of birth and native language are not necessarily indicative of racial or ethnic attributes, courts have recognized they can be used as surrogates for them.[32]

28. Id. at 289, 91 S.Ct. 633.

29. Id. at 287, 91 S.Ct. 633.

30. Id. at 287–89, 91 S.Ct. 633.

31. Id. at 290, 91 S.Ct. 633.

32. See, e.g., Hernandez v. New York, 500 U.S. 352, 371–72, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) ("We would face a quite different case if the prosecutor had justified his peremptory challenges with the explanation that he did not want Spanish-speaking jurors. It may

well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis."); Sandoval v. Hagan, 197 F.3d 484, 511 (11th Cir.1999) (enjoining state's administration of driver's license exams in English only) rev'd on other grounds, 532 U.S. 275, 279, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); Housing Rights Ctr. v. Donald Sterling Corp., 274 F.Supp.2d 1129, 1143 (C.D.Cal. 2003) (enjoining policy requiring tenants to state national origin and place of birth on

While Cantu never used the explicit words stated in the *Herald's* initial article, the standard is whether that summary was a rational interpretation of what he said.[33] Pleas for ethnic solidarity or racial prejudice are not always made in explicit terms. As Justice Peeples noted in analyzing such a plea in the context of a jury argument, "[t]o permit the sophisticated ethnic plea while condemning those that are open and unabashed would simply reward counsel for ingenuity in packaging."[34] Similarly, holding that headlines like the one here are actionable unless candidates make an explicit ethnic plea would reward candidates who make implicit ones by punishing the press for reporting on it.

This is not to say that every claim by a candidate to local community ties could be rationally interpreted as a racial plea. In a democratic republic, candidates distance themselves from local voters at their peril. Moreover, identification between voters and their representatives can help assure that republican institutions reflect the people whom they serve.

But the context here "bristled" with substantially more. The difference in the candidates' ethnic backgrounds were apparently obvious to those who attended the debate, and as we have noted the terms Cantu used to distinguish himself are similar to those sometimes used for ulterior purposes. Further, while the record does not reflect the composition of the audience at the debate, the wider audience is a matter of record—according to the U.S. Census taken in the year of the election, 84.3% of Cameron County residents were persons of Hispanic or Latino origin.[35] If Cantu's only purpose was to emphasize his community ties, he could have chosen less ambiguous terms.

While it would be up to a jury to decide what Cantu meant, the Constitution requires us to decide whether the *Herald* articles were a rational interpretation of what he actually said. In this case, there is no factual dispute as to what that was. Based on the entire context of the debate, we hold that the *Herald's* articles were a rational interpretation of Cantu's remarks at the debate. Accordingly, the articles standing alone were not evidence of actual malice.

### D

The court of appeals listed four other items of circumstantial evidence that it believed created a fact issue as to actual malice.[36]

 First, at his deposition Cantu detailed several out-of-court statements by *Herald* reporters to the effect that the

**33.** *Pape,* 401 U.S. at 290, 91 S.Ct. 633.

rental applications); *E.E.O.C. v. Premier Operator Servs.,* 75 F.Supp.2d 550, 557 (N.D.Tex., 1999) (holding company's "speak English only" policy constituted prima facie evidence of racial discrimination); *U.S. v. State of N.J.,* 530 F.Supp. 328, 335 (D.N.J.1981) (finding racial motivation in failure to hire firefighters from bilingual eligibility list); Linda M. Mealey, *English–Only Rules and "Innocent" Employers: Clarifying National Origin Discrimination and Disparate Impact Theory Under Title VII,* 74 Minn. L.R. 387 (1989) (arguing that definition of national origin should include linguistic characteristics).

**34.** *Tex. Employers' Ins. Ass'n v. Guerrero,* 800 S.W.2d 859, 862–63 (Tex.App.-San Antonio 1990, writ denied) (holding that argument by plaintiff's counsel that "by golly there comes a time when we have got to stick together as a community" was incurable when plaintiff and 11 members of jury had Spanish surnames).

**35.** U.S. Census Bureau: 2000 Census of Population and Housing, *available at*

http://quickfacts. census.gov/qfd/ states/ 48/48061.html.

**36.** 126 S.W.3d at 195.

officers of the paper "don't like you" and "had it out" for him. Assuming the truth of this hearsay,[37] it only establishes ill will, which is not proof of actual malice.[38] Jurors cannot impose liability on the basis of a defendant's "hatred, spite, ill will, or desire to injure."[39] "[E]vidence of pressure to produce stories from a particular point of view, even when they are hard-hitting or sensationalistic, is no evidence of actual malice."[40] "[A]ctual malice concerns the defendant's attitude toward the truth, not toward the plaintiff."[41] While a personal vendetta demonstrated by a history of false allegations may provide some evidence of malice,[42] free-floating ill will does not.

■ Second, the court of appeals pointed to the second *Herald* article as proof that the paper changed nothing after learning of Cantu's objections and receiving an audiotape of the debate. "The mere fact that a defamation defendant knows that the public figure has denied harmful allegations or offered an alternative explanation of events is not evidence that the defendant doubted the allegations."[43] In the world of politics, "such denials are so commonplace . . . they hardly alert the conscientious reporter to the likelihood of error."[44] The *Herald's* prompt follow-up article quoting Cantu's version of his remarks and the opinions of his supporters is evidence of the absence of actual malice, not the opposite.[45] Moreover, as pointed out above, as Cantu's remarks in the second article (which he does not claim were misquoted) carried the same ambiguities as his original remarks, the content of the second article is itself no evidence of actual malice.

■ Third, the court pointed to the questions Cox raised after reading the first article as some evidence that the newspaper entertained doubts about its veracity. But "the focus of the actual-malice inquiry is the defendant's state of mind during the editorial process. Evidence concerning events after an article has been printed and distributed, has little, if any, bearing on that issue."[46]

■ Finally, the court of appeals pointed to the opinions of an "expert journalist" criticizing the *Herald's* handling of the story and finding a consistent pattern of biased reporting regarding Cantu. But actual malice inquires only into the mental state of the defendant,[47] and the expert claimed no particular expertise in that

37. The *Herald* apparently filed no objection. *See* Tex.R. Evid. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

38. *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 161–62 (Tex.2004); *Forbes Inc. v. Granada Biosciences, Inc.,* 124 S.W.3d 167, 171 (Tex.2003); *Huckabee v. Time Warner Entm't Co.,* 19 S.W.3d 413, 424–25 (Tex.2000).

39. *Letter Carriers v. Austin,* 418 U.S. 264, 281, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).

40. *Huckabee,* 19 S.W.3d at 425.

41. *New Times,* 146 S.W.3d at 165.

42. *Bentley v. Bunton,* 94 S.W.3d 561, 602 (Tex.2002).

43. *Huckabee,* 19 S.W.3d at 427; *accord Hearst Corp. v. Skeen,* 159 S.W.3d 633, 639 (Tex.2005) (per curiam).

44. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 692 n. 37, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

45. *New Times,* 146 S.W.3d at 166; *see Skeen,* 159 S.W.3d at 639.

46. *Forbes Inc. v. Granada Biosciences, Inc.,* 124 S.W.3d 167, 174 (Tex.2003); *see also New Times,* 146 S.W.3d at 168.

47. *Forbes,* 124 S.W.3d at 173; *Bentley,* 94 S.W.3d at 591 (citing *Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979)).

field. Nor was his opinion based on anything other than the articles themselves and the circumstantial evidence already discussed. Even assuming this evidence was competent,[48] his opinions cannot show that the *Herald* knew its articles were not a rational interpretation of Cantu's remarks.[49]

\* \* \*

"[P]erhaps the largest share of news concerning the doings of government appears in the form of accounts of reports, speeches, press conferences, and the like."[50] While an increasing number of such "doings" can be viewed in full by those with Internet access and sufficient time, most members of the public rely on the myriad of other news outlets—traditional and otherwise—to provide them with a summary. As a result, press reports generally must include not a transcript of what was said but a distillation and analysis of its implications.

"Any departure from full direct quotation of the words of the source, with all its qualifying language, inevitably confronts the publisher with a set of choices."[51] Since the founding of the nation, political candidates have complained that those choices sometimes appear to adopt the most unflattering and controversial interpretation possible.[52] But nothing in the Constitution requires the press to adopt favorable attitudes toward public figures.

The summary judgment record before us establishes as a matter of law that the *Herald's* reporter thought he was reporting the gist of what Cantu said. Accordingly, any error in the *Herald's* articles evidences at most negligence, not actual malice. We reverse the court of appeals' judgment and render judgment that Cantu take nothing.

Justice JOHNSON did not participate in the decision.

---

**48.** While the opinions contain nothing beyond the competence of jurors and thus would normally be inadmissible, *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex.2000) (per curiam), the *Herald* again appears to have filed no objection.

**49.** *See Skeen*, 159 S.W.3d at 639. In light of our disposition of this issue, we do not reach the Herald's request that we revisit our holding in *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 421 (Tex.2000), and join most other jurisdictions in holding that the summary judgment record be reviewed for clear and convincing evidence of actual malice. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *New Times*, 146 S.W.3d at 168.

**50.** *Time, Inc. v. Pape*, 401 U.S. 279, 286, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).

**51.** *Id.*

**52.** *See, e.g.*, Letter from Thomas Jefferson to the president of the United States (Sept. 9, 1792), *in* 7 The Works of Thomas Jefferson 136, 146 (Paul Leicester Ford ed., 1904) ("No government ought to be without censors; and where the press is free no one ever will."); President John F. Kennedy's News Conference, 1962 Pub. Papers 375, 376 (May 9, 1962)—("I am reading [the press] more and enjoying it less."); Letter from Franklin D. Roosevelt to Colonel Edward M. House (May 7, 1934), *in* 3 The Roosevelt Letters, 125, 125 (Elliott Roosevelt ed., 1949) ("The newspapers, especially those in the East, are amazingly superficial and ... a large number of news gatherers are either cynics at heart or are following the orders and the policies of the owners of their papers."); President Ronald Reagan's Remarks at a White House Briefing for Supporters of Welfare Reform, 1987 Pub. Papers 115, 115 (Feb. 9, 1987) ("The doctors told me this morning my blood pressure is down so low that I can start reading the newspapers and watching the TV news.").