**REVERSE, RENDER, and REMAND, Opinion Filed June 26, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00848-CV

**THE DALLAS MORNING NEWS, INC., Appellant**
**V.**
**CHRISTOPHER KEVIN MAPP, Appellee**

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-02118-J**

## MEMORANDUM OPINION

Before Justices Francis, Lang, and Myers
Opinion by Justice Francis

Christopher Kevin Mapp sued the Dallas Morning News for defamation for a statement attributed to him in an editorial published when Mapp was a Republican primary candidate for the United States Senate. The News moved to dismiss the suit under chapter 27 of the Texas Civil Practice and Remedies Code, known as the Texas Citizens Participation Act and commonly referred to as an anti-SLAPP (Strategic Lawsuits Against Public Participation) statute. When the trial court failed to rule on the motion within the time period set out in the statute, the News's motion was denied by operation of law. After the News perfected its appeal, the trial court belatedly granted the motion and awarded the News some of its requested attorney's fees.

For reasons set out below, we conclude the trial court was without authority to grant the motion outside the time allowed by statute; thus, the trial court's order granting the motion is void. With respect to the denial of the motion by operation of law, the News argues, among

other things, that Mapp failed to meet his statutory burden on the element of actual malice. We agree. Therefore, we reverse the denial of the motion, render judgment dismissing Mapp's claims, and remand the case to the trial court for a determination of costs, attorney's fees, and other expenses of the News as authorized by chapter 27.

The News jointly interviewed Mapp and another candidate seeking the 2014 Republican nomination for the U.S. Senate seat held by John Cornyn. The interview was conducted by Jim Mitchell and Ralph De La Cruz, who are editorial staff writers and members of the News's editorial board. During the interview, Mapp expressed his views on a variety of issues and identified one of his "top three platforms" as immigration. He described his stance on immigration as "very hard" and advocated a "seal, defend, and protect" policy for our Southern borders. He explained:

> . . . I am not a fence man. We only build fences in East Berlin. We don't build fences in the United States. As far as our borders go, we can give immigrants a choice. *We can either ask them to respect our borders by choice or they can respect them by force. It's obvious that choice has not been working out so well.*
>
> The other part of this is since 9-11, it's really important we know who you are, why you're here, and how long you're staying and what your intentions are. So we already have border crossings. *You will only use those border crossings. If you do not use those border crossings, you are a legal, lethal target. If a rancher in South Texas is afraid for immigrants who come – illegal immigrants who come across his property, in fear of his life, he has the right to defend his property just like anybody else that has trespassers on their property.* And the problem with the porous border is we're not getting just illegal immigrants from South America all the way down, but we're also getting the drug cartel coming through there.
>
> I've had numerous people tell me that they're sitting in a deer stand and watch two guys come through. One has the AR-15; one has a big black sack on his back. It's either money or drugs, which is question number two. We're not really at war on drugs; we're at conflict with drugs. If we were at war on drugs, war means killing people and breaking the political will. We would be handling it completely different. We're talking about immigration.
>
> So my concept of the border is we have the technology to put up cameras, to have the cell phones. Somebody comes across, just like a motion detector, somebody is going to be getting a phone call, but the citizens who live on our Southern border have the right to defend their property. So we're not going to put

a fence up. We're going to allow people that live on our Southern border to defend their property. And if they get counteracted by those who want to fight back, let me tell you something, we have the manpower to send down there, and I mean enforce that border.

In later remarks, Mapp referred to illegal immigrants as "wetbacks." During the interview, he also called President Obama a "socialist son of a bitch."

Days after the interview, on February 16 and 17, 2014, the News published an editorial, authored by Mitchell, endorsing Cornyn in the Senate Republican primary. The editorial made the following comments about Mapp:

> South Texas businessman Chris Mapp, 53, told this editorial board that ranchers should be allowed to shoot on sight anyone illegally crossing the border on their land, referred to such people as "wetbacks," and called the president a "socialist son of a bitch."

Two weeks later, Mapp sued the News alleging the editorial defamed him.

In response to the lawsuit, the News filed a motion to dismiss under chapter 27, alleging the lawsuit was based on, relates to, or in response to the News's exercise of its right to free speech. Further, the News asserted Mapp could not meet his burden of establishing by "clear and specific" evidence a prima facie case for each element of his claims because the undisputed evidence shows the editorial was true, non-defamatory, and published without actual malice. The News attached the following evidence to the motion: Mitchell's affidavit, a copy of the editorial, a digital recording of the interview, a court reporter's transcription of the interview, and a copy of Mitchell's handwritten notes taken during the interview. Mapp filed a response to the motion to which he attached his own affidavit, Mitchell's affidavit, a copy of a portion of the transcribed interview, and the affidavit of his lawyer.

A hearing was held on May 23, 2014, and a ruling was required by statute within thirty days. On May 30 and again on June 13, the News wrote letters to the trial judge to remind her of the upcoming statutory deadline of June 22. When the trial court did not rule by that date, the

motion was denied by operation of law. The News perfected an appeal. Ten days later, outside the statutory time period, the trial judge signed a written judgment granting the News's motion, dismissing the case with prejudice, and awarding the News attorney's fees. Mapp then perfected an appeal from this order, and the News filed a cross-appeal challenging the amount of attorney's fees. The News also filed a conditional motion in this Court to dismiss the first appeal as moot in light of the trial court's written order, and Mapp responded. This Court consolidated the two appeals.

The TCPA protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern. *In re Lipsky*, No. 13-0928, 2015 WL 1870073, at *3 (Tex. Apr. 24, 2015). The Act provides a special procedure for the expedited dismissal of such suits. A two-step process is initiated by motion of a defendant who believes the lawsuit responds to the defendant's valid exercise of First Amendment rights. *Id.* Under the first step, the defendant-movant has the initial burden to show "by a preponderance of the evidence" that the plaintiff's claim "is based on, relates to, or is in response to the [movant's] exercise" of free speech, right to petition, or right of association. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1-3); *Lipsky*, 2015 WL 1870073, at *3. If the movant is able to demonstrate that the plaintiff's claims implicates one of these rights, the second step shifts the burden to the plaintiff to establish by "clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c); *Lipsky*, 2015 WL 1870073 at *3.

In determining whether the plaintiff's claims should be dismissed, the court is to consider the pleadings and any supporting and opposing affidavits. TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a); *Lipsky*, 2015 WL 1870073 at *3. The trial court must rule on the motion not later than the 30th day following the date of the hearing. TEX. CIV. PRAC. & REM. CODE ANN. §

27.005(a). If the trial court does not rule on the motion within the time prescribed, the motion is considered denied by operation of law. *Id*. § 27.008(a).

We begin by addressing the validity of the trial court's written order signed forty-one days after the hearing. Our sister court addressed this issue in *Direct Commercial Funding, Inc. v. Beacon Hill Estates*, *LLC*, 407 S.W.3d 398 (Tex. App.—Houston [14th Dis.] 2013, no pet.). There, the trial court signed an order granting the defamation defendant's motion to dismiss six weeks after the motion was denied by operation of law. After considering the plain language of the statute and its purpose, the Houston court concluded a trial court is not authorized to grant a motion to dismiss under the Act more than thirty days after the hearing on the motion. *Direct Comm'l Funding*, 407 S.W.3d at 401–02. As the court explained:

> The entire Act is directed toward the expeditious dismissal and appeal of suits that are brought to punish or prevent the exercise of certain constitutional rights. The distinction drawn by the legislature between extendable deadlines and firm deadlines—and more particularly, the mandatory deadline that applies to the trial court's authority to rule on a motion to dismiss—would be meaningless if the trial court, acting sua sponte, could reverse the consequences imposed by statute for the failure to timely act.

*Id*. at 401.

The court further rejected any suggestion that Texas Rule of Civil Procedure 329b provided authority for the trial court to grant the motion to dismiss after it had been denied by operation of law. Rule 329b, which governs motions for new trial and motions to modify, correct, or reform judgments, specifically empowers a trial court to "grant a new trial or to vacate, modify, correct, or reform the judgment until thirty days *after all such timely-filed motions are overruled*, either by a written and signed order or *by operation of law*, whichever occurs first." TEX. R. CIV. P. 329b(e) (emphasis added). But, as the Houston court noted, the TCPA does not contain an analogous provision empowering the trial court to grant a motion to

dismiss after it has been overruled by operation of law. *Direct Comm'l Funding*, 407 S.W.3d at 402.

We agree with the analysis employed in *Direct Commercial* and likewise conclude a trial court is without authority to grant a motion to dismiss under the Act more than thirty days after the hearing. In reaching this conclusion, we are unpersuaded by the News's argument that Texas Rule of Appellate Procedure 29.5 provided the trial court with authority to belatedly rule on the motion. Rule 29.5 provides: "While an appeal from an interlocutory order is pending, the trial court retains jurisdiction of the case and *unless prohibited by statute* may make further orders, including one dissolving the order complained of on appeal." TEX. R. APP. P. 29.5 (emphasis added). The News's argument ignores the rule's plain language excepting acts prohibited by statute. Here, the trial judge took an act prohibited by statute when she signed an order outside the statutorily mandated time period. Consequently, rule 29.5 does not apply. Because the trial court's order was signed outside the statutory time period, we conclude it is void and the controlling ruling is the denial of the motion by operation of law.

Having so concluded, we now turn to whether the trial court erred in allowing the motion to be denied by operation of law. Below and on appeal, Mapp takes issue with the editorial's "shoot on sight" statement attributed to him. He asserts that while stating concerns about illegal crossings, he said that when ranchers are "afraid" or in "fear for their life," they should be able to defend their property as would anyone else. He complains the News ignored this "significant qualifier," materially changing the meaning conveyed by his statements.

The News responds that regardless of whether Mapp used the words "shoot on sight," Mapp does not dispute he told the editorial board that immigrants illegally crossing the border should be considered a "legal, lethal target." The News argues the editorial is substantially true as a matter of law because there is no "material distinction" between saying a person may be

"shot-on-sight and that a person is a 'legal, lethal target.'"  Moreover, the News contends Mapp did not establish the statement was published with actual malice.

The parties do not dispute the News met its first-step burden of proving that Mapp's action is based on, related to, or is in response to its exercise of free speech; consequently, we address only whether Mapp has established by clear and specific evidence a prima facie case of each element of his defamation claim.

The statute does not define what is meant by "clear and specific evidence," but the Texas Supreme Court recently interpreted the plain meaning of the words "clear" and "specific" within the context of the statute. *In re Lipsky*, 2015 WL 1870073, at *6.  Clear means "'unambiguous,' 'sure,' or 'free from doubt'" and specific means "'explicit or 'relating to a particular named thing.'" *Id*. A prima facie standard generally "requires only the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id*.  It refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted. *Id*.  Together, the term "clear and specific evidence" refers to the quality of evidence required to establish a prima facie case, while the term "prima facie case" refers to the amount of evidence required to satisfy the nonmovant's minimal factual burden. *Serafine v. Blunt*, No. 03-12-00726-CV, 2015 WL 2061922, at *3 (Tex. App.—Austin May 1, 2015, no pet. h.).   The Act does not impose an elevated evidentiary standard nor does it categorically reject circumstantial evidence. *Id*. at 7.

Public officials and public figures cannot recover for defamatory statements made about them absent proof of actual malice. *New Times, Inc. v. Issacks*, 146 S.W.3d 144, 161 (Tex. 2004).  The purpose of requiring public officials to overcome this high burden is to protect uninhibited debate on public issues. *See id.* at 161–62.  It is undisputed that Mapp, as a candidate for public office, is a public official for defamation standards.  *See Freedom Newspapers of*

*Texas v. Cantu*, 168 S.W.3d 847, 853 (Tex. 2005); *Cruz v. Van Sickle*, 452 S.W.3d 503, 516 (Tex. App.—Dallas 2014, pet. filed).

Actual malice in a defamation case is a term of art. Unlike common-law malice, it does not include ill-will, spite, or evil motive. *Huckabee v. Time Warner Entertainment Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000). Rather, to establish actual malice, a plaintiff must prove the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was true or not." *Id.* (quoting *New York Times v. Sullivan*, 376 U.S. 254, 279–80 (1964)). Reckless disregard is a subjective standard, focusing on the defendant's state of mind. *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002). Mere negligence is not enough. *Id.* Rather, the plaintiff must prove "the defendant in fact entertained serious doubts as to the truth of his publication" or had a "high degree of awareness of . . . [the] probable falsity" of the published information. *Id.* (quoting *Harte-Hanks Commn's, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989).

The evidence before the trial court included the recording of the interview, a court reporter's transcription of the interview, Mitchell's handwritten notes taken during the interview, Mitchell's amended affidavit, and Mapp's affidavit. Mitchell authored the editorial at issue in this case. In his affidavit, Mitchell said he and De La Cruz jointly interviewed Mapp and another senatorial candidate. Mitchell digitally recorded the interview and took handwritten notes. When he was preparing the editorial, Mitchell said he listened to his recording and reviewed his notes; he did not have a transcription of the recording at the time.

During the interview, Mapp described undocumented immigrants as "wetbacks" and a "legal, lethal target," referred to the use of "force" to enforce our borders, and referred to President Obama as a "socialist son of a bitch." Mitchell said he believed the complained-of statement attributed to Mapp—"that ranchers should be allowed to shoot on sight anyone

illegally crossing the border—was a "fair, accurate and truthful paraphrase of the statements" by Mapp in the interview. He further said he believed the paraphrase was a "fair, accurate and truthful account" of Mapp's reference that those who did not use official border crossings to enter the United States were a "legal, lethal target" because he "understood that Mr. Mapp would allow the use of deadly force against immigrants who do no respect borders and enter a rancher's land." Mitchell's handwritten notes confirm that his "immediate mental impression" of Mapp's "legal, lethal target" statement was that Mitchell believed Mapp was saying he "would allow people to shoot anyone on his property coming from Mexico at other than legal checkpoints."

In his affidavit, Mitchell stated that at the time the editorial was published, he believed everything in the editorial was true, entertained no doubts as to its truth, had no awareness of any "probable falsity," and did not include anything he believed or suspected was false. In writing the editorial, he used his "rational interpretation" of the interview to prepare what he believed and intended to be "a truthful and factually accurate editorial" and did not omit any information that he believed was material to the editorial or that he believed would have put Mapp in a "materially more favorable light." Mitchell stated he did not believe the editorial conveyed any false or misleading statement or impression of Mapp.

In response, Mapp offered no evidence to refute Mitchell's affidavit. Instead, he argues by omitting the qualifying language "afraid" and "in fear of his life," the News materially altered the meaning of what he said by attributing to him a "shoot-on-sight 'frame of mind.'" He says Mitchell was present during the interview, listened to the audio recording, and "weighed it all" before he wrote the editorial, which he contends circumstantially establishes actual malice.

Paraphrasing or deliberately altering the words of a plaintiff does not establish actual malice unless some evidence is presented that the defendant misinterpreted the remarks on purpose or "in circumstances so improbable that only a reckless publisher would have made the

mistake." *See Cantu*, 168 S.W.3d at 855. "An understandable misinterpretation of ambiguous facts does not show actual malice." *Id.* (quoting *Bentley*, 94 S.W.3d at 596).

In *Cantu*, the supreme court considered a similar argument in the context of summary judgment. There, the former sheriff of Cameron County, Conrado Cantu, sued the local newspaper alleging he was defamed in a story about a candidate debate. *Id.* at 149. During the debate, Cantu made comments about cultural and language differences between him and his opponent and said he could address residents' needs because he was "bi-cultural." *Id.* at 850. The reporter covering the debate took notes but did not record it. (An audience member did record the event.)

The next morning, an article appeared on page one under a headline that read: "Cantu: No Anglo can be sheriff of Cameron County". In the article, the reporter used quotation marks repeatedly to indicate statements made by Cantu and his opponent. *Id.* at 851.

Cantu went to the newspaper offices that day, spoke to the editor, and objected to the use of the word, "Anglo." The newspaper published a second article the next day under the headline, "Sheriff candidate says racial issue wasn't the point". *Id.* The article contained Cantu's remarks that he never intended to suggest race was an issue in the campaign and quoted Cantu as saying, "I did not say an Anglo could not be sheriff." *Id.* at 851–52. The article also contained remarks from his opponent saying he understood Cantu's remarks to suggest he was "incapable of communicating or relating with the Hispanic culture." *Id.* at 852. Another citizen was quoted as saying he "clearly heard that the only person who could be sheriff is an Hispanic." *Id.*

Cantu ultimately won the election. After taking office, he sued the newspaper for defamation. *Id.* The newspaper moved for summary judgment, which the trial court denied. In an interlocutory appeal, the court of appeals affirmed. The supreme court, however, concluded

–10–

there was no evidence of actual malice, reversed the court of appeals, and rendered a take-nothing judgment. *Id*. at 853.

The court's decision was based, in part, on its conclusion that given the entire context of the debate, the articles were a rational interpretation of Cantu's remarks. *Id*. at 857. The court noted Cantu's remarks "bristled with ambiguities." Although Cantu asserted his remarks were not racial as anyone could be both bilingual and bicultural, the court noted the context of the statements was a debate in which Cantu was attempting to distinguish himself from his opponent. *Id*. at 856. Cantu conceded at his deposition that he knew his opponent was not Hispanic, but did not know whether he spoke Spanish, suggesting he was using "bilingual" as a race issue. Further, Cantu could not explain why his opponent was not "bicultural." The court explained these terms are "similar to those sometimes used for ulterior purposes." *Id*.

Here, Mapp does not dispute he advocated the use of force in response to immigrants who cross our borders at other than legal crossings. Although he never used the explicit words stated in the News's editorial, the standard is whether the paraphrase or summary was a rational interpretation of what he said. *See id.* at 857. Similar to *Cantu,* the context was an interview in which Mapp was attempting to distinguish himself from other senatorial candidates on the volatile issue of immigration. In doing so, he stressed he was not a "fence man." He first advocated the use of force against immigrants who cross our borders illegally and described them as a "legal, lethal target." Mapp then followed these statements with his qualifying comment that a South Texas rancher who fears for his life has the right to defend his property against a trespasser just like anyone else. He further expounded by conflating immigration and the war on drugs, giving his opinion that the "war on drugs" really is not a war at all, because "war means killing people and breaking the political will." As in *Cantu*, his remarks "bristled with ambiguities."

To establish a prima face case of actual malice, the editorial statement cannot have been a rational interpretation of what Mapp said during the interview. Considering all of the evidence presented and in particular Mapp's remarks as a whole and in the context in which they were made, we conclude the editorial is a rational interpretation of what he said. We acknowledge that "placing a reporter's words in a speaker's mouth may be evidence of malice in some circumstances." *Cantu,* 168 S.W.3d at 854. Here, however, the published statement to which Mapp takes offense—shoot on sight—was not in quotation marks in the editorial, unlike Mapp's comments referring to illegal immigrants as "wetbacks" and referring to the president as a "socialist son of a bitch." By not placing the particular offending phrase in quotation marks, the editorial signaled to its readers that he or she was reading a paraphrase and not the verbatim words of the speaker. *See id*. Moreover, the only evidence before the trial court on the editorial writer's subjective intent came from the writer's affidavit and his contemporaneous notes. Mitchell explained why he believed the offending remark was a "fair, accurate and truthful paraphrase" of Mapp's comments in the interview, and his contemporaneous notes support that the "paraphrase" was his immediate mental impression.

In sum, Mapp had the burden to establish by clear and specific evidence a prima facie case to support a rational inference that the News acted with actual malice in publishing the editorial. This required Mapp to show the News "in fact entertained serious doubts as to the truth of [its] publication or had a "high degree of awareness of . . . [the] probable falsity." *See Huckabee*, 19 S.W.3d at 420. As said previously, that it was an "understandable misinterpretation" of ambiguous facts is not enough; rather, Mapp was required to show the News misinterpreted his remarks on purpose or "in circumstances so improbable that only a reckless publisher would have made the mistake." *See Cantu*, 168 S.W.3d at 855; *Bentley*, 94 S.W.3d at 596. The evidence relied on by Mapp does not meet this test.

Reviewing the record as a whole, we conclude the trial court erred by denying the News's motion by operation of law. We reverse the denial of the News's motion to dismiss by operation of law and render judgment dismissing Mapp's claims. We remand the cause to the trial court for a determination of costs, attorney's fees, and other expenses as authorized by statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009. We dismiss all issues related to the cross-appeal.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

140848F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THE DALLAS MORNING NEWS, INC.,
Appellant

No. 05-14-00848-CV     V.

CHRISTOPHER KEVIN MAPP, Appellee

On Appeal from the 191st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-02118-J.
Opinion delivered by Justice Francis;
Justices Lang and Myers participating.

In accordance with this Court's opinion of this date, the trial court's order denying by operation of law the Dallas Morning News's motion to dismiss is **REVERSED** and judgment is **RENDERED** that appelleee Christopher Kevin Mapp's claims are dismissed. We **REMAND** the cause to the trial court for a determination of costs, attorney's fees, and other expenses authorized by section 27.009 of the Texas Civil Practice and Remedies Code.

It is **ORDERED** that appellant The Dallas Morning News, Inc. recover its costs of this appeal from appellee Christopher Kevin Mapp.

Judgment entered this 26th day of June, 2015.