**BELO CORP., The Dallas Morning News, L.P., Belo Interactive, Inc., The Dallas Morning News of Texas, Inc., Alfredo Corchado, and Laurence Iliff, Appellants,**

v.

**PUBLICACIONES PASO DEL NORTE, S.A. DE C.V., Appellee.**

No. 08–06–00113–CV.

Court of Appeals of Texas, El Paso.

Sept. 20, 2007.

Rehearing Overruled Dec. 19, 2007.

Paul C. Watler, Jackson Walker L.L.P., Dallas, for Appellant.

Joseph G. Chumlea, Shackelford, Melton & McKinley, LLP, Dallas, J. Morgan Broaddus III, Gordon & Mott P.C., El Paso, for Appellee.

Before CHEW, C.J., McCLURE, and CARR, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

> This sprawling city is either a playground for murderous drug traffickers and serial killers or a flawed border town maligned by muckraking journalists who have turned the killings of some women by resentful macho men into a global cause celebre. Those opposite views belong to the men who publish the city's most influential newspapers.

Thus begins an article written by Alfredo Corchado and Laurence Ilifff and published in *The Dallas Morning News* on July 4, 2004, bearing the headline: "Newspapers In Fight Over Juarez's Image" (the article).

Residents of the El Paso/Juarez border communities are keenly aware of the series of female homicides in Juarez which began back in 1993. The deaths of more than 400 women have received wide media attention throughout the United States and Mexico. The average age of the victim was sixteen and roughly a third of them worked in the *maquiladoras* of Juarez. According to an article by *The Village Voice,* more than one-third of the victims were raped before they were killed, and the bodies bore signs of captivity and torture.

The article in issue portrays how *El Diario,* published by Osvaldo Rodríguez Borunda, and *Norte de Ciudad Juárez,* published by Oscar Cantú Murguia, view the killings and the effect on the image of the city. *Norte* has theorized that the rich, the powerful, the government, organ traffickers, or Satanists have perpetrated the murders, while *El Diario* takes the position that the murders are domestic

killings.[1]

The article also highlights the growth of *El Diario* to a daily circulation of 60,000, making it the largest newspaper in Juarez. Meanwhile, *Norte's* circulation has dwindled from 30,000 to less than 18,000. Cantú blames the decline on government officials whom he says have withheld government advertising and threatened local vendors who sell his newspaper. Rodríguez disputes the charges that he has soft-peddled his reporting in return for government advertising. The article reports that the Juarez city government accounted for $400,000 of *El Diario's* advertising revenue in 2003 while the Chihuahua state government spent $350,000. The piece concludes:

> Mr. Rodriguez said he's in no one's pocket.... He said government advertising accounts for only a small fraction of his ad revenue.... But *El Diario* is full of advertising, while *Norte* is not.

## THE LAWSUIT

Publicaciones Paso Del Norte, S.A. de C.V. (*El Diario* ) filed suit against Belo Corp., *The Dallas Morning News*, L.P., Belo Interactive, Inc., *The Dallas Morning News of Texas, Inc.*, Alfredo Corchado and Laurence Iliff, (collectively "Belo") alleging claims for defamation[2] and business disparagement.[3] Belo unsuccessfully sought summary judgment on both traditional and no-evidence grounds, the former asserting that Belo had negated actual malice, the latter contending there was no evidence of actual malice. Belo brings this interlocutory appeal complaining that the trial court erred in denying summary judgment relief. *See* Tex.Civ.Prac. & Rem. Code Ann. § 51.014(a)(6) (Vernon Supp. 2006).[4] Because we conclude *El Diario* has not raised a genuine issue of material fact that Belo acted with actual malice, we reverse and render judgment in favor of Belo.

## STANDARD OF REVIEW

A libel defendant is entitled to a traditional summary judgment if it can negate actual malice as a matter of law. *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex.2005). A no-evidence motion for summary judgment is also a proper vehicle for alleging that a plaintiff has not raised a genuine issue of material fact that the defendant acted with actual malice. A no-evidence summary judgment is essentially a pretrial directed verdict and we apply the same legal sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118

---

1. Rodríguez testified on deposition: "They—that they have not been serial killings at all. They have been just domestic problems. Remember in—that in maquila, in Juarez, brought thousands of women to work. In Mexico, we macho men don't like our women to work. But the necessity makes you acknowledge it. So, I think that a lot of the killings have been just killings between husband and wife, between people that hate each other, and for reasons have been covered up as serial killings."

2. In its first amended petition, *El Diario* alleged Belo's defamatory publication constituted defamation *per se* and defamation *per quod*.

3. El Diario ultimately non-suited its claim for business disparagement.

4. We have jurisdiction via interlocutory appeal because the trial court denied Belo's motion for summary judgment that was "based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73." *See* Tex.Civ.Prac. & Rem.Code Ann. § 51.014(a)(6).

S.W.3d 742, 750 (Tex.2003). The moving party must specifically state the elements as to which there is no evidence. *Gray v. Woodville Health Care Center,* 225 S.W.3d 613, 616 (Tex.App.-El Paso 2006, pet. denied); *see* Tex.R.Civ.P. 166a(I). The burden then shifts to the non-movant to produce evidence raising a genuine issue of material fact regarding each element challenged. *Gray,* 225 S.W.3d at 616. The evidence is reviewed in the light most favorable to the non-movant and we must disregard all contrary evidence and inferences. *King Ranch,* 118 S.W.3d at 751. A genuine issue of material fact is raised if the non-movant produces more than a scintilla of evidence regarding the challenged element. *Id.* at 751. Less than a scintilla of evidence exists if the evidence is so weak as to create no more than a mere surmise or suspicion. When the evidence rises to a level that enables reasonable minds to differ in their conclusions then more than a scintilla of evidence exists. *Id.*

### ELEMENTS OF THE CLAIM

 *El Diario* concedes it is a public figure for purposes of defamation. To establish a claim for defamation, it must demonstrate that: (1) Belo published a factual statement; (2) that was capable of defamatory meaning; (3) concerning *El Diario;* (4) while acting with actual malice regarding the truth of the statement. *See WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998); *Provencio v. Paradigm Media, Inc.,* 44 S.W.3d 677, 680–81 (Tex.App.-El Paso 2001, no pet.). Under Texas law, even if individual statements considered in isolation are literally true or non-defamatory, a publication can convey a false and defamatory meaning by omitting or juxtaposing facts. *See Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex. 2000). Whether a publication is false and defamatory depends on a "reasonable person's perception" of the entire publication, not merely individual statements. *See id.* at 115. A publication as a whole may be defamatory if the publication creates a false impression. *See id.* at 117–18.

### ACTUAL MALICE

This case turns on the fourth element: Did Belo act with actual malice regarding the truth of the statements?[5]

 The phrase "actual malice" in the context of defamation does not include ill will, spite, or evil motive. *Huckabee v. Time Warner Entertainment Company L.P.,* 19 S.W.3d 413, 420 (Tex.2000). Instead, a public figure must prove that the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was true or not." *See id.,citing New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Reckless disregard is also a term of art. *Huckabee,* 19 S.W.3d at 420. To establish reckless disregard, a public figure must prove that the publisher "entertained serious doubts as to the truth of his publication." *Id.,citing St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Perhaps the very best explanation appears in *Bentley v. Bunton,* 94 S.W.3d 561, 596 (Tex.2002). Justice Hecht writes:

> To summarize, the actual malice standard requires that a defendant have, subjectively, significant doubt about the truth of his statements at the time they are made. To disprove actual malice, a defendant may certainly testify about

---

**5.** We need not decide whether the article was actually false to resolve this appeal. The plaintiffs can prevail here only if there is some evidence that Belo published the article with actual malice.

his own thinking and the reasons for his actions, and may be able to negate actual malice conclusively. But his testimony that he believed what he said is not conclusive, irrespective of all other evidence. The evidence must be viewed in its entirety. The defendant's state of mind can—indeed, must usually—be proved by circumstantial evidence. A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered. An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is. Imagining that something maybe true is not the same as belief. (s deleted).

*Bentley*, 94 S.W.3d at 596.

■ This case differs from other libel suits in that the defamation arises not from false statements articulated in the publication, but from the false impression that *El Diario* soft-peddled news investigations regarding the Juarez murders in order to obtain advertising from the government. Where a defamation claim arises not from individual false statements, but rather from a defamatory impression created by the publication as a whole, a public figure must present evidence that the defendant knew or strongly suspected that the publication as a whole could present a false and defamatory impression of events. *See Turner*, 38 S.W.3d at 120.

■ The purpose of the actual malice standard is to protect innocent but erroneous speech on public issues, while deterring "calculated falsehoods." *See Turner*, 38 S.W.3d at 120, *citing Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209,

13 L.Ed.2d 125 (1964). "Knowledge of falsehood is a relatively clear standard; reckless disregard is much less so." *Bentley*, 94 S.W.3d at 591. Reckless disregard is a subjective standard that focuses on the conduct and state of mind of the defendant. *Id.* Mere negligence is not enough. There must be evidence "that the defendant actually had a 'high degree of awareness of . . . [the] probable falsity' of his statements." *Id., citing Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). A public figure may rely on circumstantial evidence to prove a defendant's state of mind. *Bentley*, 94 S.W.3d at 591.

■ Belo offered the affidavits of the authors, Alfredo Corchado and Laurence Iliff, and *The News'* foreign editor, Tim Connolly. Both Corchado and Iliff stated that at the time they published the article, they believed the statements in the article were true, they did not believe the article conveyed a false or misleading impression, and they wrote what they intended to be a truthful and factually accurate article. Tim Connolly edited the piece and gave final approval prior to publication. In his affidavit, Connolly stated he had worked with both authors for a number of years and knew them to be reliable and accurate journalists. Connolly believed the article accurately quoted or paraphrased the persons or organizations identified. His reporters performed an accurate investigation and he believed everything in the article was true. He had no awareness that any of the article was probably false, and he had no doubts whether the article was factually accurate. Since neither the authors nor the editor entertained any doubts as to the articles accuracy, Belo has produced some evidence negating actual malice. *See Freedom Newspapers of Texas v. Cantu*, 168 S.W.3d 847, 853

(Tex.2005)(affidavits from publisher and copy desk editor averring that neither had knowledge of inaccuracies or any reason to doubt accuracy of articles was some evidence that newspaper acted without malice and shifted burden to plaintiff to produce contrary evidence to avoid summary judgment); *Hearst,* 159 S.W.3d at 637 (affidavit of author stating he believed the article was true and accurate based on his extensive research negated actual malice and the burden shifted to plaintiffs to raise fact issue). The burden now shifts to *El Diario* to raise a fact issue as to actual malice. *Id.*

■ In determining whether *El Diario* raised a fact issue, we must assume that all facts favorable to *El Diario* are true and we will indulge all reasonable inferences in its favor. *Huckabee,* 19 S.W.3d at 424. *El Diario* contends Belo acted with actual malice because the article contained glaring omissions resulting in gross distortions, the article contained misleading paraphrasing and misrepresentations about government advertising, and Belo had an injurious motive against *El Diario.*

### Glaring Omissions and Distortions

*El Diario* alleges Belo acted with actual malice by grossly distorting the truth regarding *El Diario's* perspective on Ciudad Juarez, *El Diario's* reporting, and *El Diario's* criticism of activist groups. According to *El Diario,* the gross distortion itself constitutes some evidence of actual malice. *See Huckabee,* 19 S.W.3d at 426.

■ First, *El Diario* argues Belo grossly distorted the truth regarding its perspective on Juarez. It points to the opening paragraph of the article, which we have already quoted. Rodríguez claims that he never said Juarez is a "flawed border town." He told Iliff in an interview that Juarez authorities were negligent in investigating the murders, that drug traf-

ficking and murder were serious issues in Juarez, that Juarez has a high incidence of drug addiction, that life in Juarez has no value, that a hit man can be hired for $5,000, and that Rodríguez's close friend was killed. Rodríguez characterized Juarez as a "mean, murderous place" and not a "flawed border town." We perceive this as a distinction without a difference. The article simply paraphrased the description rather than using a direct quote. *See Freedom,* 168 S.W.3d at 854, *citing Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 519–20, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991)(every alteration of a speaker's words is not some evidence of actual malice). It did not grossly distort his viewpoint and does not constitute actual malice. *Id.* at 855 (proof that a plaintiff did not make the exact remark, standing alone, is not evidence of actual malice). In fact, Rodríguez testified that one of his many viewpoints of Juarez was that it is a flawed border town maligned by muckraking journalists.

Secondly, *El Diario* contends the article's depiction of its journalistic reporting was glaringly deceptive. By mentioning only two of the paper's articles as examples of its reporting, Belo created a false impression of its coverage. In May 2004, *El Diario* criticized the finances of activist groups dedicated to the Juarez victims. *Norte,* meanwhile, published an expose of police corruption in neighborhood drug houses. A few days later, federal commissioner Guadalupe Morfin Otero released a report criticizing state authorities for jailing innocent people in connection with the killings. *El Diario* ran a story about Morfin's report at the bottom of the page under the headline "Commissioner Files Report and Announces Public Works" with a subhead reading, "Morfin Accused of Election Law Violations." *Norte's* front page story declared, "Morfin Reveals Im-

punity." *El Diario* contends Belo ignored *El Diario's* coverage exposing the jailing and torturing of two innocent men and left out the fact that Rodríguez had voiced deep criticisms about the government. It thus concludes that Belo acted with actual malice by selectively presenting examples of its reporting.

 A public figure may recover for the omission of facts only by presenting evidence that the publisher selected the material with actual malice. *See Huckabee*, 19 S.W.3d at 426. This requires evidence that the defendant selected the material with the awareness that the omission could create a substantially false impression. *Id.* The omission may be so glaring as to result in a gross distortion of the story that by itself it constitutes evidence of actual malice. *Id.* In such cases, the omission must be such that it changes the character of the story that "one could infer that the defendant knew, or at least suspected, that the omission would convey a false impression." *Id.*

 Here, the article's focus was to highlight the differing approaches between *El Diario* and *Norte* regarding the Juarez murders. *El Diario* introduced numerous articles, translations, and summaries covering protests against the murders, the demand by Amnesty International for more investigatory resources, and the promise by the special prosecutor to take action if she found governmental negligence in the investigation. Although *El Diario* has written other articles on the Juarez murders, it has not established that Belo's selection of two of articles and its omission of others was purposefully done to create a false impression. The fact that Belo did not include an analysis of every article does not establish that Belo acted with actual malice. *See Turner*, 38 S.W.3d at 122 (libel law cannot require a news organization to air the interviews of every-

one who might speak on a public figure's behalf); *Huckabee*, 19 S.W.3d at 425 (evidence of producing a story from a particular point of view, even when they are hard-hitting or sensationalistic, is no evidence of actual malice). *El Diario* has not shown that Belo knew it was creating the false impression. *Huckabee*, 19 S.W.3d at 426 (although the documentary did not convey plaintiff's position as strongly as it could have been, the law did not require it to do so).

 Next, *El Diario* contends Belo distorted the truth about one of its critics and invented the other. The article stated:

> In May, *El Diario* ran a critical examination of the finances of activist groups dedicated to the Juarez victims.

> · · ·

> Mr. Rodriguez's critics, including actress Jane Fonda and non-government organizations such as Casa Amiga, say he soft-peddles suspected links between politicians and drug traffickers and spends little investigative time on the women's killings.

*El Diario* first faults Belo's reliance upon the criticism by Casa Amiga. *El Diario* published an article on April 20, 2004, charging that the director of the organization sought donations to provide aid to the victims' families but failed to do so. It also contends the statement that *El Diario* ran a "critical examination of the finances of activist groups dedicated to the Juarez victims" was distorted because the April 20 article showed Casa Amiga was not "dedicated" to the victims, but was profiting instead. This is not evidence that the organization's views were false. And Belo's reliance upon a biased source does not establish that it acted with actual malice. *See Dolcefino v. Turner*, 987 S.W.2d

100, 119 (Tex.App.-Houston [14th Dist.] 1998), *aff'd*, *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex.2000)(evidence that source was motivated by strong political bias did not amount to evidence of actual malice).

 *El Diario* also claims Belo distorted Jane Fonda's comments. On Valentine's Day 2004, activist groups rallied along the border, chanting *"ni una mas"*—"Not one more." Thousands gathered at the international bridge and marched down Lerdo Avenue in Juarez. Joining the protest was Eve Ensler, author of the *Vagina Monologues*, whose international non-profit organization, V–Day, co-sponsored the event with Amnesty International. Jane Fonda, Sally Field, and Christine Lahti joined the protest and Fonda actively participated in a press conference. According to Corchado, Fonda criticized the media's coverage of the Juarez murders, asking why it took international movie stars to show up before the news media covered the story. Although Fonda did not expressly mention *El Diario*, Corchado interpreted her criticism of the local media to include *El Diario*, which is the city's largest newspaper. At most, the reference to Fonda was an error in judgment arising from Corchado's interpretation of her comments. Errors in judgment are not evidence of actual malice. *See Huckabee*, 19 S.W.3d at 426 (HBO's failure to capture accurately all the story's details suggests an error in judgment, which is no evidence of actual malice); *Turner*, 38 S.W.3d at 122 (discrepancy in segment's language may have been manipulated to have deceived viewers, but there was no evidence that the defendant knew or strongly suspected that the seg-

ment would mislead viewers and lack of clarity alone is not evidence of actual malice); *Bentley*, 94 S.W.3d at 594, *citing Time Inc. v. Pape*, 401 U.S. 279, 290, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (interpretation that omitted the word "alleged," although reflecting a misconception, was not evidence of actual malice); *Freedom*, 168 S.W.3d at 855 (an understandable misinterpretation of ambiguous facts does not show actual malice). *El Diario* has failed to establish that the alleged omissions and gross distortions constituted evidence that Belo acted with actual malice.

### Misleading Paraphrase

 *El Diario* next objects to the article's statement that "Mr. Rodríguez said he's in no one's pocket." It claims that Rodríguez never made the statement and that it was substantially different from what he actually did say.[6] One of the early drafts of the article contained the following:

> Mr. Rodríguez said he does not need the government. 'They are important (income) sources, but they are not determinate for the newspaper,' he said.

> The final draft deleted the exact quotation and substituted the paraphrase, "Mr. Rodríguez said he's in no one's pocket."

Paraphrasing or deliberately altering the words of a plaintiff does not establish actual malice unless some evidence is presented that the defendant misinterpreted the remarks on purpose or the circumstances are such that only a reckless publisher would have made the mistake. *See Freedom*, 168 S.W.3d at 855. Belo admitted to

---

**6.** Rodríguez testified in his deposition that the statement was true. He also said that he strongly objected to the notion that any government official or anyone else controlled his newspaper, that he did not believe he was in Governor Martinez's, the mayor's, or any other government official's pocket, and that he did not have any complaint regarding this paragraph of the story.

paraphrasing Rodríguez's comments, but *El Diario* still has not established Belo purposefully misinterpreted Rodríguez's remarks or that the error was such that only a reckless publisher would have made the mistake. *See id.* at 857.

### Injurious Motive

Finally, *El Diario* contends that Belo had a financial motive to harm *El Diario's* credibility with its readers. Belo, who had an interest in expanding into the Hispanic-newspaper market, had failed to reach an agreement with *El Diario* regarding possible joint ventures along the Texas and California borders with Mexico. Lennox Samuels is *The Dallas Morning News* Mexico City Bureau Chief. He testified by deposition that *The News* had made inquiries about publishing a Spanish or English newspaper in markets along the U.S./Mexico border. It spoke with several Mexican news organizations, including *El Diario*, from the mid- to late–1990s into early 2000. These discussions focused on Spanish-language papers in El Paso, Tijuana, and San Diego. In addition to the possibility of a Spanish-language product along the border, *The News* also investigated other possibilities, including information-sharing. *The New York Times* then published an article in 2003 profiling *El Diario's* plans to unilaterally expand its publishing into the United States to compete with *The El Paso Times*, a newspaper that Rodríguez claimed gave "short shrift" to Juarez and the Hispanic majority in El Paso. Entitled "Shaking Up Journalism In El Paso," the article cautioned that Rodríguez's plans "threat[en] to touch off a newspaper war unlike any seen in the United States for a long time." In March 2004, Belo entered into a joint agreement by which *Norte* gained the right to republish articles from *The News* in Spanish. A second contract granted *Norte* the right to republish *The News'* articles in English,

beginning in April 2005. Belo claims this was a wire-service agreement and that *Norte* paid for the rights. The record reveals that *Norte* was also negotiating with *The El Paso Times*, which was looking to *Norte* as a way to fend off *El Diario*. They entered into a distribution agreement in late 2004.

In the spring of 2005, *El Diario de El Paso*, a Spanish-language newspaper, began publication in El Paso. By that time, Belo was publishing *La Prensa* in Riverside, California; *El D* in Coachella Valley, California, and *Al Dia* in Dallas. Belo contends that none of its Spanish newspapers are located along the U.S./Mexico border, nor do they compete with *El Diario* in either Juarez or El Paso. And because *El Diario* failed to present any evidence that *Norte's* compensation to *The News* was tied to its circulation, Belo argues there was no evidence that at the time the article was published, *The News* competed with *El Diario*.

 *El Diario's* arguments that Belo had an injurious motive to ruin its reputation are certainly factors to be considered. *Hearst,* 159 S.W.3d at 639, *citing Bentley,* 94 S.W.3d at 596 (an injurious motive is a factor to be considered in a determination of actual malice). But an injurious motive alone is not sufficient to establish actual malice. *Id.* The fact that a defendant may publish defamatory material to increase its own profits does not suffice to prove actual malice. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 665, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

### When Actual Malice Can Be Inferred

 Actual malice cannot be inferred from the fact a publication is not substantially true as determined from the meaning a reasonable person would attrib-

ute to the article, nor can it be inferred from the falsity of a statement alone. *Dr Partners D/B/A The Sherman Herald Democrat v. Floyd,* 228 S.W.3d 493, 498 (Tex.App.-Texarkana 2007, pet. filed). But it may be inferred from the relationship of the parties, the circumstances surrounding the publication, the terms of the publication itself, and from the words or acts of the defendant before, at, or after the time of the communication. *Id. El Diario* contends that actual malice can be inferred here because the record shows the depth and breadth of the authors' knowledge of the paper's reporting, yet they selected and mis-described two stories that distorted the truth. Belo counters that even if the article included inaccurate characterizations and quotations, it amounts to no more than the "sort of inaccuracy that is commonplace in the forum of robust debate...." *Id.* at 500, *citing Bose Corp. v. Consumers Union,* 466 U.S. 485, 513, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

*El Diario* also directs us to the recent case of *Texas Disposal Systems Landfill, Inc. v. Waste Management Holdings, Inc.,* 219 S.W.3d 563 (Tex.App.-Austin 2007, pet. filed). There, the parties competed for a contract to provide waste removal and landfill services to the City of San Antonio. After the city council authorized the contract with Texas Disposal, but before the contract was finalized, the City of Austin sought bids from both companies. Waste Management then caused an "Action Alert" to be circulated to a targeted audience of Austin officials which addressed San Antonio's proposed contract with Texas Disposal. The memo warned of increased traffic and environmental problems, and questioned the environmental integrity of the Texas Disposal landfill. Don Martin was the consultant hired by Waste Management to draft the memo. He testified that at the time of publication, he didn't believe any of the statements to

be false and that he didn't intend to convey the message that Texas Disposal's landfill was illegal, environmentally unsound, or lacking a leachate collection system. Yet he also testified that by saying the landfill was an "exception" to the EPA rules, he intended to convey the message that the landfill was not in compliance with federal regulations. He admitted that the purpose of the Action Alert was to prevent San Antonio from signing the contract with Texas Disposal and that the "not in compliance" language was specifically designed to achieve that purpose. This conflicting evidence was resolved by the fact finder—the jury—which entered an affirmative finding of actual malice. The appellate court found the evidence sufficient to support that finding. We do not disagree with either opinion. We do believe, however, that before actual malice can be inferred, there must be more than a scintilla of evidence upon which to base the inference.

## CONCLUSION

After a thorough review of all of the evidence, and considering the defamatory impression created by the publication as a whole, we conclude that there is less than a scintilla of evidence to create a genuine issue of material fact concerning actual malice. In reaching this conclusion, we draw heavily from *Hearst,* which we find most factually analogous. There, an article entitled, Justice Under Fire was written by Evan Moore and published in *The Houston Chronicle.* It criticized the Smith County criminal justice system which it claimed was "noted for its own brand of justice" that was "driven by aggressive prosecutors who achieve some of the state's longest sentences." *Hearst,* 159 S.W.3d at 636. The piece was accompanied by three companion articles that examined specific cases.

The district attorney and two of his assistants filed suit, contending that Moore knew the article was false because the ten cases discussed in the article comprised a relatively insignificant sample (.04%) from which to conclude that the office routinely engaged in unethical practices to win convictions. Moore admitted he had performed no statistical analysis but had focused instead on the problem cases he had discovered. The Supreme Court determined that "the fact that Moore had not reviewed every indictment during D.A. Skeen's service or discussed a larger number of problem cases is not evidence that he knew the article contained false statements." *Id.* at 637. Nor was the court persuaded that the plaintiffs had raised a fact issue despite claims that "*Hearst* and Moore purposefully avoided the truth, relied on dubious information from bias [sic] sources, deviated from professional standards of care, and were motivated to fabricate." *Id.,citing Bentley,* 94 S.W.3d at 596. Moreover, "[t]he mere fact that a defamation defendant knows that a public figure has denied harmful allegations or offered an alternative explanation of events is not evidence that the defendant doubted the allegations." *Id.,citing Huckabee,* 19 S.W.3d at 427.

Because we conclude *El Diario* has not raised a genuine issue of material fact that Belo acted with actual malice, we sustain the sole issue for review. Accordingly, we reverse and render judgment in Belo's favor.