Opinion issued June 5, 2008








 


     



In The
Court of Appeals
For The
First District of Texas




NO. 01-08-00009-CV




JIANGUANG WANG AND YELLOW EMPEROR COMMUNICATIONS,
INC. D/B/A HOUSTON CHINESE PRESS, Appellants

v.

DAVID TANG, Appellee




On Appeal from the 164th District Court 
Harris County, Texas
Trial Court Cause No. 2007–24344




O P I N I O N

          In this interlocutory, accelerated appeal, we determine whether the trial court
properly denied the motion for summary judgment filed by the Houston Chinese
Press


 against David Tang’s libel claims. Because Tang, who is a limited purpose
public figure, did not present sufficient summary judgment evidence to raise an issue
of material fact on the element of actual malice to support his libel claim, we
conclude that the Houston Chinese Press was entitled to summary judgment. 
          We reverse and render.
Background
          The Chinese Civic Center (“the CCC”) is a non-profit organization promoting
and offering social, cultural, and educational activities for the Houston Chinese
community. The CCC serves an important and integral role in that community. 
          In 2005, the CCC assisted in bringing the Beijing People’s Art Theater to
Houston to perform the play Teahouse. After the Houston performance, concerns
arose in the Chinese community regarding the CCC’s financial accounting relating
to the performance. A concern also arose in the community regarding whether the
CCC had sufficient funds to continue operating. 
          On April 22, 2006, the CCC held a press conference to introduce its new
officers and board members and to discuss CCC accounting and financial issues,
including those relating to the Teahouse performance. At the beginning of the press
conference, David Tang was introduced as new vice-chair of the CCC. Members of
the Chinese community and the Chinese-language media, including the Houston
Chinese Press’s editor-in-chief, Jianguang Wang, attended the meeting. During the
press conference, the board members responded to questions posed by the audience
regarding the CCC’s finances and operations. Some in the audience were critical of
the board’s management and, at times, the atmosphere of the press conference was
tense. 
          Tang acted as the master of ceremonies at the press conference, but did not
answer any of the audience’s questions. At the end of the press conference, Tang
made the following closing remarks:
Lastly, I only want to say one word. What? Last year we had the
celebration of the 60th anniversary of the victory of the Anti-Japanese
War. They had a saying at that time. What is that saying? I would like
to use it today. The saying is this: Facing the invasion of the Japanese
Devils, they said this saying “as long as we are alive, we shall not lose
one inch of ground.” I want to use this saying as a conclusion to today’s
meeting. So long as the new board of directors are serving, so long
as we get the support from our warmhearted friends in the
community, we, the Chinese Civic Center, for sure, for sure, who
already have ten years of brilliant service and for sure, will have ten
more years of brilliant service. I thank everybody. The conference
is ended. Thank you all. 
(Emphasis added.)
          On April 30, 2006, the Houston Chinese Press published an article (“the
article”) entitled, “Guizi [translated: “Japanese Invaders”] are Coming: Board of
Civic Center Have Vowed to Resist Japanese.” The article reported some of the
questions posed by the audience, criticized the adequacy of the board’s responses, and
highlighted accounting discrepancies relating to the CCC’s finances. The article also
quoted the portion of Tang’s of closing remarks referencing the invasion by the
“Japanese Devils,” but did not include the remainder of Tang’s remarks, which are
bolded above. In reference to Tang’s closing remarks, the article stated as follows,
in part, and as translated from Chinese to English:


 
“Japanese Invaders” certainly refers to the enemies in the war in which
Japanese invaded China, the Japanese Guizi who looted, massacred,
raped and committed all manners of crimes on Chinese people for as
long as eight years. David Tang used the “invasion of Japanese
invaders” as an analogy, then he had “fight to the death in defense of
one’s front,” then he had teamwork of the board of [the] Chinese Civic
Center team up, etc. If we deduct [sic] in this way, David is having the
community as the battlefield, moreover, the battlefield of fighting
against Japanese, and having the Chinese Civic Center as the front,
moreover, the front to fight against Japanese invaders. People who
attended the news press meeting on that day feel puzzled in and after the
meeting. Are the “Japanese Invaders, referred [to] by David Tang, the
news media, or the presenting persons who support, care for and make
donations to [the] Chinese Civic Center? If in the eyes of some directors
of [the] Chinese Civic Center, the Chinese in the community actually
become the “Japanese Invaders,” who cannot live under the same sky
due to hatred, all persons in the Houston Chinese Community other than
[the] Chinese Civic Center, the front, will be Japanese and “Chinese
Civic Center” will become an anti-Japanese organization accordingly
and matter-of-factly. Meanwhile, the fund to fight against Japanese
needs to be obtained from Japanese Invaders.
 
People feel compelled to ask again, that while [the] Chinese Civic
Center reiterate since its inception that it is to be owned by all, now all
were put in categories of “Japanese Invaders” for just asking a few
questions eyed by the community. . . . 
          . . . . 
CCC is the home of the overseas Chinese in Houston. To love one’s
home is the heritage of many Chinese. We hope there is a good
management of CCC. Only those [who] love their home will denounce
the unlawful acts of the management. Even though we are considered
as “Japanese Invaders,” we still love our home.

          . . . .
 
Don’t regard those who raised questions to CCC as “trouble makers.” 
Do not regard those people that love CCC as Japanese Invaders while
consider himself as the heroes on Lang Yanshan. Do not put the interest
of someone in the CCC board above the whole interest of CCC. 
Otherwise, if the “Japanese Invaders” are coming, can you hold your
own front? Please remember, to hold on to the front will not be you
guys, it will be the whole community who were smeared to be “Japanese
Invaders” that love the Chinese People.
          Eleven months later, Tang filed suit against Wang and the Houston Chinese
Press, asserting a libel claim based on the April 30 article. Specifically, Tang alleged
that, by failing to publish the entirety of his closing statement from the press
conference, the Houston Chinese Press intentionally misrepresented and “distorted”
his remarks to mean that Tang was referring to the Chinese community and the media
as “Japanese Invaders.” Tang claimed that, when heard in its entirety, his closing
remark could only be interpreted to mean: “That working together with the members
of the community, the Chinese Civic Center would move forward into the next decade
of dedicated service to the members of the Houston Overseas Chinese Community.” 
Tang vehemently denied that, by his closing remarks, he was referring to the Houston
Chinese community as “Japanese Invaders” or “guizi.” 
          The Houston Chinese Press moved for summary judgment on Tang’s libel
claim. Among the grounds for summary judgment was the Houston Chinese Press’s
assertion that it had not published the alleged defamatory statements with actual
malice. 
          Tang amended his petition to include libel claims based on other statements in
the April 30 article besides those relating to the Japanese invasion reference. The
Houston Chinese Press supplemented its motion for summary judgment to assert that
the new allegations of libel were time-barred. Following a hearing, the trial court
granted the Houston Chinese Press’s motion for summary judgment regarding the
additional libel claims added by Wang in his amended petition. The trial court denied
the Houston Chinese Press’s motion for summary judgment as to Wang’s libel claims
arising from those statements in the article asserting that Wang had called those in the
Houston Chinese community, who questioned the board “Japanese Invaders” or
“guizi.” 
          The Houston Chinese Press filed this interlocutory appeal challenging the trial
court’s denial of its motion summary judgment relief. See Tex. Civ. Prac. & Rem.
Code Ann. § 51.014(a)(6) (Vernon Supp. 2007). 
Traditional Summary Judgment Standard and Elements of Claim
          We review a summary judgment ruling pursuant to a de novo standard. 
Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003). When
conducting our review, we take the nonmovant’s competent evidence as true, indulge
every reasonable inference in favor of the nonmovant, and resolve all doubts in favor
of the nonmovant. Diversicare Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842, 846
(Tex. 2005). A defendant may prevail by traditional summary judgment if it defeats
at least one essential element of the plaintiff’s claim as a matter of law. See Science
Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997).
          To establish his defamation claim, Tang, a limited purpose public figure,


 must
show that the Houston Chinese Press published the allegedly defamatory statements
with actual malice. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S. Ct.
2997, 3008 (1974); WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998). 
The Houston Chinese Press may prevail on its motion for summary judgment by
offering evidence negating the actual malice element as a matter of law. See Hearst
Corp. v. Skeen, 159 S.W.3d 633, 637 (Tex. 2005); Huckabee v. Time Warner Entm’t
Co. L.P., 19 S.W.3d 413, 420 (Tex. 2000). Once the Houston Chinese Press meets
this burden, then Tang must present evidence raising a genuine issue of material fact
regarding actual malice to avoid summary judgment. Huckabee, 19 S.W.3d at 420. 
                                          Constitutional Actual Malice
A.      Applicable Principles
          In defamation suits involving public figures, the actual malice standard serves
to protect innocent but erroneous speech on public issues, while deterring “calculated
falsehoods.” See Turner v. KTRK Television, Inc., 38 S.W.3d 103, 120 (Tex. 2000). 
A showing of “actual malice” in a defamation suit requires proof that the defendant
made a statement with knowledge that it was false or with reckless disregard of
whether it was true or false. New Times, Inc. v. Isaacks, 146 S.W.3d 144, 162 (Tex.
2004); Huckabee, 19 S.W.3d at 420. Reckless disregard is a subjective standard,
focusing on the defendant’s state of mind. Isaacks, 146 S.W.3d at 162; Bentley v.
Bunton, 94 S.W.3d 561, 591 (Tex. 2002). Specifically, the plaintiff must establish
that the defendant in fact entertained serious doubts as to the truth of his publication,
or had a high degree of awareness of the probable falsity of the published
information. Isaacks, 146 S.W.3d at 162 (citing Bentley, 94 S.W.3d at 591) (internal
quotations omitted). A public figure may rely on circumstantial evidence to prove a
defendant’s state of mind. Bentley, 94 S.W.3d at 591.
B.      Wang’s Evidence Negating Actual Malice
          To negate the actual malice element, the Houston Chinese Press offered the
affidavit of its editor-in-chief, defendant, Jianguang Wang. Affidavits from interested
witnesses will negate actual malice as a matter of law only if they are “clear, positive
and direct, otherwise credible and free from contradictions and inconsistencies, and
could have been readily controverted.”


 Tex. R. Civ. P. 166a(c); see Huckabee, 19
S.W.3d at 424. In a defamation suit, a defendant is permitted to testify by affidavit
about his subjective state of mind and his belief about the challenged statement’s
truth or falsity. See Casso v. Brand, 776 S.W.2d 551, 559 (Tex. 1989). But, to
negate actual malice, a defendant’s affidavit must establish his belief in the
challenged statement’s truth and provide a plausible basis for his belief. Huckabee,
19 S.W.3d at 424. Wang’s affidavit meets these requirements.
          First, Wang’s affidavit establishes his belief in the truth of the allegedly
defamatory statements. Wang testified that, at the time of publication, he “knew of
no statement” in the article that was “false” and “had no doubts as to the truth of any
statements” in the article. More specifically, Wang testified, in relevant part,
I was surprised and shocked to hear Mr. Tang refer to the Japanese
invasion of China at the end of this confrontational meeting. I
understood Mr.Tang’s comment to be directed towards those members
of the audience and media who were raising questions about the
Teahouse performance and the CCC’s explanation of its finances and
accounting. In my opinion, the only thing that Mr. Tang could have
been referring to in his comment about the Japanese invasion were the
people raising questions about the CCC, nearly all of whom were
members of the Chinese community.

          . . . . 
 
I understood Mr. Tang’s words in the context of the contentious meeting
that was coming to a close. I understood Mr. Tang’s words regarding
the “Japanese invaders” and the “defense of our position” to be referring
to the people who were questioning the CCC’s actions and his own
defense of the CCC’s positions. I understood Mr. Tang to be comparing
the people who were questioning the CCC to China’s enemies. Perhaps
Mr. Tang’s statements were exaggeration or hyperbole, but I had no
doubt that his statement was referring to the persons who had questioned
the CCC’s actions.
          The affidavit also established that Wang had a plausible basis for his belief that
the allegedly defamatory statements were true. Wang stated that he attended the CCC
press conference and heard Tang make the statement referencing the Japanese
invasion of China. Wang explained the historical significance to the Chinese
community of Tang’s reference to the Japanese invasion. Wang described his
underlying thought process to show why he believed that the Houston Chinese
Press’s statements are truthful. Specifically, he explained that Tang’s comments
came at the end of a “confrontational meeting” between the audience, “nearly all of
whom were members of the Chinese community,” and the CCC board, of whom Tang
was a member. In this context, it appeared to Wang that the audience members,
including the media present, were the Japanese enemy to whom Tang referred in his
closing statement.
          Wang also testified that he heard other members of the audience express shock
at Tang’s comments, including one woman who, upon hearing the reference to the
Japanese invasion exclaimed, “My God!” Wang averred in his affidavit that this
reaction indicated to him that others in the audience also interpreted Tang’s reference
to the Japanese invasion as he did. 
          Wang buttressed his testimony with the affidavits of five other audience
members, who also heard Tang’s remarks. These five individuals interpreted Tang’s
comments in the manner reported by the Houston Chinese Press. Specifically, four
of the affiants understood Tang to be equating the audience’s questions regarding the
CCC’s operations and finances to the Japanese invasion of China, to be comparing
the audience, who were members of the Chinese-language media and the Chinese
community, to the “Japanese invaders,” and to be likening the CCC board to the
defending Chinese army. The fifth affiant testified that he believed that Tang had
“confused the audience with the Japanese invaders.” 
          Wang further supported his testimony by offering two articles from other
Chinese-language newspapers, which discussed the press conference. One of the
articles, which appeared in the Chinese Times, described the tension that arose during
the press conference between those asking questions and the CCC board. Referring
to Tang’s remark that, during the Japanese invasion, Chinese soldiers said that “we’ll
fight to the death in defense of our position,” the article noted that Tang “said this
probably to express his determination to do a job well. But some media were not
happy with what he said. One reporter said: ‘We have all turned into Japanese devils
and puppet troops.’” The other article, which appeared in the Chinese-language
newspaper the World Journal, describe the contentious nature of the press
conference. 
          Based on the summary judgment evidence offered, we conclude that Wang
negated the actual malice element. Wang’s affidavit is “clear, positive, and direct,
otherwise credible and free from contradictions and inconsistencies, and could have
been readily controverted.” See Tex. R. Civ. P. 166a(c). In his affidavit, Wang does
not simply deny actual malice; rather, he provides a detailed explanation of his state
of mind and describes the basis for his belief. Accordingly, the burden shifts to Tang
to raise an issue of material fact regarding actual malice. See Freedom Newspapers
of Tex. v. Cantu, 168 S.W.3d 847, 853 (Tex. 2005) (concluding that affidavits from
publisher and copy desk editor averring that neither had knowledge of inaccuracies
or any reason to doubt accuracy of articles was evidence that newspaper acted without
malice and shifted burden to plaintiff to produce contrary evidence to avoid summary
judgment); Hearst, 159 S.W.3d at 637 (reasoning that author’s affidavit stating that
he believed article was true and accurate based on his extensive research negated
actual malice and burden shifted to plaintiffs to raise fact issue); Isaacks, 146 S.W.3d
at 164–65 (reversing denial of media defendants’ motion for summary judgment on
ground that affidavits of editor-in-chief, managing editor, and author negated actual
malice as matter of law).
C.      Tang’s Evidence Regarding Actual Malice
          1.       “Omission” of Part of Tang’s Statement
          As mentioned above and as reflected in the summary judgment evidence, Tang
made the following statement at the close of the press conference:
Lastly, I only want to say one word. What? Last year we had the
celebration of the 60th anniversary of the victory of the Anti-Japanese
War. They had a saying at that time. What is that saying? I would like
to use it today. The saying is this: Facing the invasion of the Japanese
Devils, they said this saying “as long as we are alive, we shall not lose
one inch of ground.” I want to use this saying as a conclusion to today’s
meeting. So long as the new board of directors are serving, so long
as we get the support from our warmhearted friends in the
community, we, the Chinese Civic Center, for sure, for sure, who
already have ten years of brilliant service and for sure, will have ten
more years of brilliant service. I thank everybody. The conference
is ended. Thank you all. 
The evidence shows that the Houston Chinese Press published only part of Tang’s
statement; it did not publish the bolded portions of Tang’s remarks.
          In his affidavit, Tang explained his statement as follows: 
The slogan is a commonly used slogan, even today. The meaning of the
slogan is that, as long as we work together and continue to persevere, we
can overcome any obstacle. As the last sentences make abundantly
clear, the reasons I said this was to conclude on a positive note: that as
long as the Chinese Civic Center and its warmhearted friends in the
community work together, the Center will continue to provide service
to the Chinese Community in the future, and will even provide better
service. When I said my statements I heard round of applause. I did not
hear any booing.
          For summary judgment purposes, we assume the truth of Tang’s assertion that
he intended his statement to be a call for the Chinese community to unify to overcome
the financial difficulties faced by the CCC. See Cantu, 168 S.W.3d at 855
Nonetheless, to avoid summary judgment, Tang is still required to offer evidence
establishing that the Houston Chinese Press acted with actual malice in its
publication. See id. 
          In this regard, Tang contends that the “alteration” of his statement by the
Houston Chinese Press is itself evidence raising an issue of material fact regarding
actual malice. Tang asserts that, by omitting the above-bolded language, the Houston
Chinese Press “altered” and “distorted” Tang’s statement and changed its meaning
“entirely.” Tang contends that the Houston Chinese Press knowingly and
intentionally omitted the last part of his remarks to create a false impression. Tang
points out that the Houston Chinese Press used the “altered” version to support its
claim that Tang called the Chinese community “guiza” or “Japanese Devils.” 
          Tang reasons that the act of knowingly publishing only part of the quote is
itself evidence that the Houston Chinese Press acted with actual malice. More
specifically, Tang avers that actual malice is shown when “a defendant knowingly
publishes an altered or incomplete quote and that altered or incomplete quote is
materially different from the actual quote.”


 To this end, Tang offers summary
judgment evidence to show that Wang was aware of the entire statement, but chose
to publish only part of it. Tang cites evidence showing that Wang personally heard
Tang’s remarks at the press conference and also viewed a videotape of the statement
before the article was published. 
          In his summary judgment response, Tang asserts, 
The fact that Defendant had a video of the conference and had actual
knowledge of what Mr. Tang said but nonetheless omitted half of the
statement to change the meaning is conclusive evidence that Defendants
published the statement with knowledge it was substantially altered or
with reckless disregard as to whether it was substantially altered. 
          Contrary to Tang’s position, this alone is not sufficient to raise a fact issue
regarding actual malice. Rather, a public figure seeking to recover for an omission
must show that the publisher selected the material with actual malice. Huckabee, 19
S.W.3d at 426. For an omission to be evidence of actual malice, the plaintiff must
prove that the publisher knew or strongly suspected that the omission could create a
substantially false impression. Turner, 38 S.W.3d at 121. The omission may be so
glaring and may result in such a gross distortion that, by itself, it constitutes some
evidence of actual malice. Huckabee, 19 S.W.3d at 426. “In such a case, the
omission so changes the character of the story that one could infer that the defendant
knew, or at least suspected, that the omission would convey a false impression.” Id. 
          Here, the overall purpose of the Houston Chinese Press article was to report
what transpired at the press conference. According to the article, the CCC board
inadequately answered inquiries regarding the CCC’s finances, leaving many
questions unanswered. The article focused on the contentiousness of the press
conference and the perceived hostility toward those who questioned the board. It was
in this context that the Houston Chinese Press quoted Tang regarding his analogy to
the Japanese invasion of China. 
          Although the Houston Chinese Press did not publish the entirety of Tang’s
closing remarks, Tang has not offered summary judgment evidence to show that the
Houston Chinese Press knew or strongly suspected that failing to include the last
portion of his statement could create a substantially false impression. As discussed,
Wang testified in his affidavit that he believed, in the context of the contentious press
conference, that Tang was referring to those in the Chinese community questioning
the CCC board as “Japanese enemies.” This, to Wang, was the “noteworthy” or
newsworthy comment made by Tang. It follows that this was the portion of Tang’s
remarks that the Houston Chinese Press choose to publish. We do not agree with
Tang’s assertion that the omitted portion of his statement “specifically rebut[s] the
defamatory charge that [the] article imputed to [Tang].” Rather, this is but one
interpretation depending on the listener’s point of view. 
          In the absence of evidence that it omitted Tang’s remarks to portray his
statements falsely, the First Amendment protects the Houston Chinese Press’s
editorial choice regarding what material it included in the article. See id. Tang
offered no evidence to controvert Wang’s testimony regarding his interpretation of
Tang’s remarks. Nor has Tang offered sufficient evidence to show that Wang’s
interpretation was not a plausible or reasonable one in light of the tenor of the press
conference and the provocative nature of Tang’s analogy. See Cantu, 168 S.W.3d at
855 (holding that understandable misinterpretation of ambiguous facts does not show
actual malice). 
          Given Wang’s understanding of Tang’s comments, the fact that the Houston
Chinese Press did not publish all of Tang’s closing remarks does not itself raise a
material fact issue regarding actual malice. See Huckabee, 19 S.W.3d at 425
(concluding that evidence showing publication is produced from particular point of
view, even if hard-hitting or sensationalistic, is not evidence of actual malice). At
most, the Houston Chinese Press’s decision to include only the first part of Tang’s
statement was an error in judgment arising from Wang’s interpretation of Tang’s
comments. Errors in judgment are not evidence of actual malice. See Time Inc. v.
Pape, 401 U.S. 279, 290, 91 S. Ct. 633, 639 (1971) (rejecting plaintiff’s claim that
defendant’s interpretation that omitted word “alleged” was evidence of actual malice,
although such interpretation was a misconception); Huckabee, 19 S.W.3d at 426
(concluding that, even though omitted facts may have allowed reasonable viewer to
reach opposite conclusion from what was reported, media defendant’s failure to
capture accurately all details suggests error in judgment, which is no evidence of
actual malice).
          We conclude that Tang has not shown that the Houston Chinese Press’s
decision not to publish his entire closing remarks raises an issue of material fact
regarding actual malice.
          2.       Expert Witness Testimony
          To raise an issue of material fact regarding actual malice, Tang submitted the
“expert affidavit” of John Robbins, “an editor for the largest Chinese press in
Houston,” who offered his opinion regarding the article. Before forming his opinion,
Robbins watched a video of the press conference and read the subject Houston
Chinese Press article. In his affidavit, Robbins opined that “[t]o publish and refer to
only half of the actual quote as the entire quote, and then editorialize from that ‘half
quote’ is not responsible journalism . . . .” Robbins averred that “the only reason for
publishing only a select portion of Mr. Tang’s statement appears to have been to
intentionally misrepresent what Mr. Tang actually said, and then to proceed with the
publishing of an article based on that misrepresentation.” 
          Contrary to Tang’s assertion, Robbins’s testimony is not probative of actual
malice. “An expert’s testimony ‘is not probative of actual malice because [his]
opinion relates to a reckless disregard for a standard of objectivity, not for the truth.’” 
Gonzales v. Hearst Corp., 930 S.W.2d 275, 283 (Tex. App.—Houston [14th Dist.]
1996, no writ) (quoting Harris v. Quadracci, 856 F. Supp. 513, 519 (E.D. Wis.
1994)). Moreover, actual malice inquires only into the mental state of the defendant,
and Robbins claimed no expertise in that field. See Cantu, 168 S.W.3d at 858–59. 
Robbins’s opinion was not based on evidence that gave particular insight into the
defendants’ mental state; rather, his opinion was based on his reading of the article
and on his viewing of the videotape of the press conference. See id. at 859. 
Assuming the “expert affidavit” was competent evidence, Robbins’s opinion does not
raise a genuine issue of material fact with regard to whether the Houston Chinese
Press published the alleged defamatory statements with knowledge that they were
false or with reckless disregard of whether they were true or false. See id.
Conclusion
          The summary judgment record establishes, as a matter of law, that the Houston
Chinese Press did not publish the alleged defamatory remarks with actual malice. 
Tang has not carried his summary judgment burden to show that a genuine issue of
material fact exists with regard to the actual malice element. We hold that the
Houston Chinese Press is entitled to summary judgment. 
          We sustain the Houston Chinese Press’s first issue,


 reverse the trial court’s
order to the extent that it denies the Houston Chinese Press’s motion for summary
judgment, and render judgment that Tang take nothing. 




                                                             Laura Carter Higley
                                                             Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.