# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00043-CV

**Craig Miller and Treasa Miller, Appellants**

**v.**

**Superior Forestry Service, Inc., Appellee**

### FROM THE DISTRICT COURT OF RUNNELS COUNTY, 119TH JUDICIAL DISTRICT
### NO. 15,248, HONORABLE BEN WOODWARD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After 61 cattle died on their cattle ranch, appellants Craig Miller and Treasa Miller sued appellee Superior Forestry Service, Inc. and three other defendants who were later discharged from the lawsuit. The Millers alleged that Superior had trespassed on their ranch, that while there, Superior had contaminated the brush and water with chlorate, and that the cattle died as a result of ingesting the chlorate. The dispute was submitted to a jury, which returned a ten-to-two verdict in favor of the Millers on their claims for trespass and negligence. Superior filed a motion for judgment notwithstanding the verdict ("JNOV"), and following a hearing, the trial court granted the motion, entering a judgment that the Millers should take nothing in their claims against Superior. It is from the JNOV that the Millers appeal. As explained below, we will affirm the trial court's final judgment.

**Standard of Review**

"It is well established that jurors are the sole judge of the credibility of the witnesses and the weight to be given to their testimony" and "are free to credit one witness's testimony and disbelieve another's." *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *City of Austin v. Chandler*, 428 S.W.3d 398, 407 (Tex. App.—Austin 2014, no pet.); *see Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it."); *In re Doe 2*, 19 S.W.3d 278, 299 (Tex. 2000) (Hecht, J., dissenting) ("It is ordinarily the province of the finder of fact to determine, without explanation, the credibility of witnesses. Must a court or jury explain why it chose to disbelieve a witness in any other proceeding? Of course not."). However, the jury's decision that a witness is not credible generally "is not considered a sufficient basis for drawing a contrary conclusion." *Bose Corp.*, 466 U.S. at 512; *see Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 853 (Tex. 2005) ("Jurors of course would not be required to accept the truth of these affidavits. But the possibility that a jury might disbelieve them is not evidence supporting the contrary."); *Breen v. DeLord*, 723 S.W.2d 166, 170 (Tex. App.—Austin 1986, no writ) ("[T]he jury was free to disbelieve and disregard Breen's testimony concerning the contents of the April 18 letter. No one disputes that premise. The jury's refusal to believe Breen's testimony, however, does not somehow create affirmative evidence that Breen knew that the letter was false.").

A reviewing court cannot overturn a jury's verdict merely because it might reach a different result. *Wilson*, 168 S.W.3d at 819; *Chandler*, 428 S.W.3d at 407; *Texas Dep't of Criminal Justice v. McElyea*, 239 S.W.3d 842, 849 (Tex. App.—Austin 2007, pet. denied). Instead, a trial

court may disregard a jury's verdict and render a JNOV only if no evidence supports one or more of the jury's findings or if a directed verdict would have been proper. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Brown v. Bank of Galveston, N.A.*, 963 S.W.2d 511, 513 (Tex. 1998). Thus, we view the evidence under the standards applied to our usual legal-sufficiency review, *see Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003), asking whether the plaintiff produced any evidence of probative force to support each issue of material fact in support of its claim, *see Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 70 (Tex. App.—Austin 1998, no pet.).

"A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (cleaned up). "If more than a scintilla of evidence exists, it is legally sufficient," and "[m]ore than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence." *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782-83 (Tex. 2001). Reviewing courts "must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Wilson*, 168 S.W.3d at 822. "Both direct and circumstantial evidence may be used to establish any material fact," but "the evidence must transcend mere suspicion. Evidence that is so slight as to make any inference a guess is in legal effect no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). Thus, we assume that the jury resolved all conflicts of credibility in favor of its verdict, crediting favorable

3

evidence and disregarding contrary evidence if a reasonable juror could do so, and ask whether there was more than a scintilla of evidence to support the jury's verdict. *Chandler*, 428 S.W.3d at 407.

In this case, which was based on circumstantial evidence, our review requires us to assess the inferences reached by the jury, which makes the analysis more complicated. "An inference is not reasonable if it is susceptible to multiple, equally probable inferences, requiring the factfinder to guess in order to reach a conclusion." *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015). A jury "may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another." *Kingsaire, Inc. v. Melendez*, 477 S.W.3d 309, 313 (Tex. 2015) (quoting *Hancock v. Variyam*, 400 S.W.3d 59, 70-71 (Tex. 2013)). If a claim is "supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists." *Wilson*, 168 S.W.3d at 813. "Thus, when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *Id*. at 814. In such a case, the record must contain "something else" that corroborates the probability of the inferred fact's existence or non-existence. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 729 (Tex. 2003).

Multiple inferences may be drawn from a single fact situation, and circumstantial evidence can thus give rise to separate inferences, each of which supports a different element of a claim. *See McClure v. Allied Stores of Tex., Inc.*, 608 S.W.2d 901, 904 (Tex. 1980); *Farley v. MM Cattle Co.*, 529 S.W.2d 751, 756 (Tex. 1975). However, an inference stacked only upon other inferences, rather than supported by direct evidence, is not legally sufficient evidence. *See Pitzner*,

4

106 S.W.3d at 728. An inference is not reasonable "if it is premised on mere suspicion—some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Suarez*, 465 S.W.3d at 634 (cleaned up). And, if the evidence allows for "only one inference, neither jurors nor the reviewing court may disregard it." *Wilson*, 168 S.W.3d at 822.

## Factual Summary

The cause was tried in a two-week trial in October 2016, about three years after 61 head of cattle died in September 2013. We will summarize the evidence that could under the applicable standards reasonably support the jury's verdict. For the purposes of our analysis, we will assume without discussion that the Millers established that the cattle died from ingesting chlorate, that human activity led to a large quantity of chlorate being present on the Millers' property, and that the likely location of the chlorate exposure was along or near to the rights-of-way. The only issue we need consider is whether the evidence sufficiently established that Superior was responsible for the presence of the chlorate.

Chlorate is an inorganic salt primarily used as a cotton defoliant or a woody plant herbicide. In 2006, the Environmental Protection Agency determined that it should no longer be used for defoliating rights-of-way. There was also evidence that although chlorate had been "primarily used to help defoliate the cotton," it was "completely out of the picture" because more effective products had been developed. The experts testified that it would take about one pound of chlorate to kill a cow, meaning the cattle must have eaten the equivalent of about 60 pounds of dry chlorate, and that the cattle died within about 24 hours of eating the chlorate.

5

The Millers own a cattle ranch in Runnels County. Two large power lines, one owned by NextEra Energy and the other owned by Oncor Electric, run through the property, parallel and close to each other. Those lines were constructed in about 2008 and 2011, and both energy companies hired Superior to spray herbicides along the rights-of-way under the lines so that the areas were accessible for maintenance work. Mesquite is found along the rights-of-way and is difficult to control, and an expert who specializes in agricultural botany testified that an 80% mesquite-control rate would be considered successful. Superior was the only contractor hired to work in the relevant area in 2012 and 2013. Craig Miller explained that the road under the Oncor line was driveable but that the area under the NextEra line was "so thick in mesquite" that it was impassable. He also testified that the first time either of the rights-of-way on their property were sprayed was in 2012, when Superior was hired to spray along the Oncor line.

Superior uses a custom-blended herbicide made by Dow Agrosciences under the name Aqumix. The custom herbicide has trace amounts of chlorate but the experts agreed that the amount of chlorate present in the herbicide would not have killed the cattle. Superior president Michael Foley testified that Superior has blue dye added to their Aqumix so that crew members can tell the areas that have already been treated. Andrew Harnage, a Superior crew supervisor, testified that at the time, Superior's contract with NextEra specified a 95% "control rate," meaning it was not necessary to achieve "complete mortality of the plant as long as . . . the top portions [are] killed out where they could get in and access and do maintenance on their lines." Superior returns to respray at its own expense if the specified percentage of brush is not controlled after the initial spraying. Foley testified about the drums of Aqumix, explaining that they are sealed by the manufacturer with

6

a "Micro Matic valve," meaning nothing can be added to the drum, and that the herbicide is transferred from the drums "through a series of chem locks" directly into spray backpacks worn by crew members on a work site.[1] Antonio Ortiz, the crew leader on the days in question, testified in his deposition that his truck carries a 200-gallon tank that he uses to "carry some water to make mixes," but there was no evidence as to whether or how the tank was used in the relevant time frame.

In late July 2013, Superior was working for NextEra, spraying portions of its right-of-way near the Millers' property; the Millers' property was not part of the project. On July 29, Superior was working north of the Miller property, spraying Sites 17, 18, and 20. Harnage was the crew supervisor, and Ortiz was the crew leader. Harnage testified that there were two crew trucks out that day, but other testimony indicated there might have been three. Superior president Michael Foley testified about Superior's "spill kits," which include kitty litter or another oil absorbant, "a shovel, [and] plastic trash bags." Company policy dictates that spray crews have their spill kits with them while working, but on July 29, Harnage's crew left their spill kit behind at their hotel.

Most of the crew members did not know whose property they were on while they worked. One crew member explained, "[W]e follow the line just spraying, and then the crew leaders are the ones who have the map, and we just follow," and another said, "They just send us to go spray there. We don't even know where we are." At one point on the morning of July 29, Harnage left the crew working at Site 20 and drove to get a chainsaw and to buy a flat-tire kit. Asked whether the crew had a tire-repair kit the last few days of working "in mesquite country," Harnage answered,

---

[1] A "manager of Aqumix Services" testified similarly, agreeing that the drums used are "a sealed system" and that workers in the field "don't have the equipment necessary to insert" anything.

"I wasn't sure if we did not—did or did not have one. At some point [Ortiz] and I discussed whether he had one or not, and he said that he did not. And so when I had the chance, I went and bought one." Other than during his absence picking up those items, Harnage seems to have been responsible for leading the crew to each work site. Either Harnage or Ortiz had keys and combinations for the locks along the right-of-way, including locks on the gates to the Millers' ranch.

Daily record reports completed by Ortiz show that the crew was at Site 20 from 7:00 to 7:30 a.m., at Site 18, from 7:30 a.m. to 4:30 p.m., and at Site 17 from 4:30 to 5:30 p.m. However, Harnage had on his cell phone a photograph of Ortiz taken at Site 17, and metadata from the phone indicates that the picture was taken at 3:30 p.m. The next photograph stored on Harnage's phone was taken early on the morning of July 31; two photographs, taken at some point between 3:30 p.m. on July 29 and 6:30 a.m. on July 31, were missing. Harnage testified that he had no idea what the missing two photos might have been of, saying, "I can't say for certain that I even took photos. I could have saved some photos and then deleted them, or taken photos that were blurry and then deleted them, but I can't say for certain what those two other images between would have been." Harnage also testified that he provided all of the photos he had on his phone for a thirty-day period around the end of July 2013 and that there were several gaps in that set of photos, agreeing when asked if there were "a few missing all over the place." He further explained that some of the photos on his phone were not taken by him but instead had been sent to him by other people.

Harnage testified that after the crew finished at Site 17, the last work site for the day, he and Ortiz took the chain saw back to Site 20 to cut down some trees. Ortiz, however, testified in his deposition that he returned directly to the hotel after working on Site 17. Ortiz could not

remember when he returned to the hotel and said, "Perhaps when it was already dark,"[2] but his daily report stated that the crew finished their work at Site 17 at 5:30 p.m.  Ortiz further testified that he kept accurate records of his mileage while working and that on July 29, he traveled 147 miles; he did not remember the routes he took or the roads he drove on.  Harnage, on the other hand, testified that his mileage on July 29 was approximately 100 miles and that it appeared that Ortiz's mileage reports were "not correct."  However, Harnage acknowledged that "the hundred miles is a ballpark of approximation of driving only from . . . the southern end of Abilene down to Site 20 and to 18, past 18 and then over to 17, and then straight back to Abilene.  It didn't include driving back to Site 20."  Harnage stayed at a different hotel than did the crew.  He testified that it was about ten miles south on the right-of-way from Site 17 to the Miller property and that the drive took about two hours.  Foley testified that after learning of the cattle's death, he asked Harnage what roads the crew took on July 29, and that Harnage said he "didn't know."  Harnage testified at trial that he did not enter the Millers' property in late July 2013, either while doing the NextEra job or while assessing the area for the 2014 bid.  Asked, however, whether he had ever been on the Miller ranch "for any reason whatsoever," Harnage said, "I don't know."  The Millers presented evidence related to the mileage of routes in the area, including evidence that it was 14.32 miles from Site 17 along the right-of-way through their ranch to FM 2132 south of their property.  Treasa Miller testified that she drove from their ranch to the crew's motel in Abilene and that the total mileage was about 106 miles.

On July 29, starting at about 6:15 p.m., Harnage called Rich Hendler a total of four times; he also texted Hendler three times on July 29 or 30.  Hendler was a Dow Chemical salesman

<hr>

[2] The Millers established that "civil twilight" on July 29 was approximately 9:00 p.m.

and representative, and Foley agreed that Hendler was Superior's "question man" or "go-to man" when they had "questions about chemicals" or "environmental issues." Foley said that if Superior had "an environmental issue," Superior would call Hendler, and he would "put us in touch with an expert, if we need it." Harnage testified that Hendler "gives advice about spraying herbicide" and that he and Hendler had done "some training . . . on spills and how you should handle spills." However, Harnage testified that he had no idea what he and Hendler talked about on July 29 and 30. Harnage further testified that he and Hendler were friends outside of work, that they discussed different projects, and that they did not talk more about the NextEra project than other jobs.

At about 10:30 p.m. on July 29, Harnage bought one bottle of Crisco-brand Omega-3 canola oil, two bottles of dish soap, and two two-packs of shop towels at Wal-Mart. Harnage explained that shop towels were used in the field for a variety of things, including cleaning herbicide off of a spray backpack or wiping sweat or dirt from crew members' hands or faces, and testified that he bought one pack of towels and one bottle of soap for each truck. Harnage also testified that he had never used canola oil to clean anything and that he did not buy the least expensive oil available. Asked whether he remembered why he had bought the oil, he said, "Not specifically. I imagine for cooking, but not specifically, no." Foley agreed when he was asked whether those items might be used to clean out tanks, explaining that oil can be used to remove water from spray tanks, but also noted that such items have numerous other uses as well. Foley testified that mineral oil would be a cheaper product to use to clean out spray tanks. He was asked whether canola oil is "something you would use if there was some sort of herbicide spill," and answered, "No, sir."

10

Doug Smoot, who worked for NextEra, testified that Harnage and his crew picked up drums of Aqumix from the warehouse on July 27.[3] On July 30, Harnage and his crew returned to the warehouse to drop off empty drums and load up new drums. During that time, Smoot heard Harnage and his crew "talking about how rough the roads were and bouncing stuff around in the back of the trucks." In an email sent August 1, an Aqumix account manager stated that Harnage had texted pictures of a drum that "has a split near the bottom and is leaking product." Harnage reported losing about two gallons of product and asked for a credit for the lost herbicide. Photos show a small crack in one of the drums and fluid leaking out, and Harnage said he noticed the crack on August 1 but did not see any puddles or pools of liquid on the floor of his truck bed. He said that he decided to use the drum of herbicide because the crew needed it and "to try to get it empty as quick as possible in case it did decide to leak." He did not know exactly where the crew was working on August 1, but he thought it was a site south of the Millers' property. He again denied driving through the Millers' property to get to the southern spray sites.

On Ortiz's paperwork for July 29, he used "Wite-Out" on the "Product Mix section, Prior Day Carryover," writing "8" as the answer. Ortiz also neglected to use certain conventions in

---

[3] The Millers point to evidence they assert raises a question as to how many trucks Superior was using on July 29. Harnage insisted that the crew only had two trucks on the job on July 29 and that he and his crew had two trucks and a trailer when they loaded the herbicide on July 27. Although Smoot testified that he saw three white trucks when the herbicide was loaded that day, other testimony indicated that a second vegetation management company was working in the area, that the other company also uses white trucks, and that the third truck Smoot saw was owned by that company. A NextEra employee also testified that he saw Superior using three trucks "in July of 2013" when he "was on the south end of the line when they were finishing up," but it is unclear when exactly that was.

11

completing that day's report, as compared to most of the other reports he filled out for Superior.[4]

Asked about differences between his July 29 report and most of his other records, Ortiz said that he "forgot" why he did not use the conventions or habits he usually used and that "there are days when I get out of work extremely tired, and sometimes I forget something." A witness who handled Superior's billing process said it appeared "that maybe [Ortiz] wrote a wrong number or something and had to fix it." She noted another area of correction on Ortiz's forms and said that corrections happen from time to time.

Michael Foley testified that three drums, each of which were identified by number, were returned empty despite being omitted from Ortiz's records from the NextEra job. He said, "I can't explain why they weren't recorded. We know they got there. We have documentation that they got there, and we have documentation that the drums left there empty." He said that the full NextEra job took about ten days, and that during that time, crew members might have forgotten to record a drum as required. He explained that they "didn't turn up missing one particular day, it was over the course of this project."

Harnage denied that he or the crew had sacks or any amount of chlorate in their trucks and agreed that Superior was "working up on a deadline" when doing the NextEra work. Although the Miller property was not part of the 2013 NextEra project, Harnage knew Superior would be bidding on a 2014 project that would include the Miller ranch. Harnage testified that at some point, in preparation for the 2014 bid, he went to look at some of the areas that would be involved but did

---

[4] Ortiz did not write the word "gallon" or the abbreviation "gal," as he usually did; he did not write the product used; he did not draw certain lines he usually used; and he did not write anything in the notes section.

not recall whether he drove through the Miller ranch; Harnage thought he drove "through that area on some main highways." Asked whether it would give Superior a competitive advantage to view the areas in advance of submitting a bid, Harnage said it might if he knew "which line and which areas to go look at."

On September 13, 2013, Craig Miller was told that the cattle on his land were dead or dying. Some were dead when he arrived, and several others died while he was there. In all, 61 cattle died. Miller had seen the cattle about a week earlier and testified that they looked fine at that time. Miller testified that he did not notice anything unusual about the foliage in the area until the cattle died, at which time he noticed several dead mesquite bushes with circles of bare ground around them. He said that there were "[t]oo many to count," from one end of the Oncor right-of-way to the other and that there no similar areas outside of the Oncor line.

Veterinarian Mark Swening testified that he examined one of the cows and determined that the animal died of hypoxemia, or lack of oxygen; he did not test the rest of the cattle. Swening took samples from that cow's eye and its rumen, which is a cow's first stomach. The ocular fluid had chlorate in it, the "rumen content had 62,000 parts per million," and the lab report said, "It is very important to identify the source of chlorate because neither the dead forage nor the unlabeled forage appear to contain toxic chlorate concentrations." One of the expert testified that the cow that was tested ate about three pounds of chlorate, possibly more.

Swening and Craig Miller viewed the property for the source of chlorate and located under one of the power lines a "real definitive" area of dead grass. Swening also saw near the Oncor line a dead mesquite bush surrounded by a close perimeter of dead grass. Swening took soil and

13

grass samples from near those areas. The soil samples from inside the dead grassy area had between 11 and 18 parts per million, as opposed to approximately 6 parts per million outside the perimeter. Although 18 parts per million is not a dangerous level of chlorate, an expert testified that such levels were "almost a hundred percent without a doubt not natural" and instead were "man-influenced." The grass, or "forage," taken from the two spots in the dead grassy area showed 270 and 470 parts per million, and Swening testified that he believed the dead grassy area under the right-of-way was the "source area" despite the levels of chlorate not being in the toxic range. He said, "Even though it's not toxic, there's some reason for there to be more chlorate inside that than outside that perimeter." The soil taken from under the dead mesquite tree had 23 parts per million.

Superior's custom-blend Aqumix has about 80 parts of chlorate per billion, and the evidence was that it would take "swimming pools" worth of herbicide to reach toxic levels. An expert also testified that the only way 80 parts per billion, as found in Aqumix, would increase to 23 parts per million, as found under the mesquite bush under the Oncor line, was with a "spike" of chlorate. Foley testified that when Superior sprays mesquite bushes with Aqumix, it is not unusual for it to result in "kind of a dead spot of just soil a foot or so around that stem." Foley also testified that Superior changed its spill procedures three days after the cattle died but explained that Superior went through all of its company manuals and policies annually and that "that's the time of the year that we do that." The Millers and other witnesses did not see any blue dye, powders, barrels, or other evidence of a spill on their property. There was testimony that chlorate can be purchased online through Amazon, but no evidence of bags or other containers of chlorate seen on the Millers' property or in any Superior trucks.

14

The Millers' causation argument was summed up by their attorney, who explained:

Our position is not that the [leaking herbicide] drum itself caused the cows to die, it's that it made a mess in the truck and that this—this somehow made a mess, we believe, somehow caused them to have some type of accident where they had their chlorate—we believe they had chlorate in bags in the back of the pickup truck. And because of this leaking barrel or this mess that they had to clean up, that this somehow was part of the cause.

**Discussion**

We have reviewed all of the evidence put forward over the seven days of testimony, bearing in mind the standards we must apply in evaluating and considering that evidence. The jury, in making its credibility decisions, apparently found Superior's witnesses to be less believable than the Millers'. However, the jury's determination that Superior's employees were not credible cannot support a conclusion or inference that the contrary of their testimony was true. *See Bose Corp.*, 466 U.S. at 512; *see Cantu*, 168 S.W.3d at 853; *Breen*, 723 S.W.2d at 170.

The evidence showed that the Superior crew was within ten miles of the Miller ranch and had the means to open the locks and access the Miller property. The Millers argue that it was acceptable to infer from those facts that the Superior crew drove ten miles and several hours out of their way to trespass on the Millers' ranch, perhaps because Superior planned to bid for the 2014 spray job on the easement through the property. On the evidence before the jury, however, such an inference is speculative.

Further, the Millers point to the fact that chlorate was apparently used on the Miller property in the past and argue that the jury could have inferred that Superior used chlorate in its 2012 treatment of the Oncor right-of-way. However, there was no evidence that Superior had bought

15

or possessed large quantities of chlorate in July 2013, and other than the fact that Superior was hired to spray the right-of-way in 2012, there was no evidence that Superior was responsible for the earlier chlorate exposure. The record does not reflect that any tests showed that Superior had "spiked" its herbicide or otherwise used significant amounts of chlorate in their work in July 2013. Again, the evidence presented gives scant support for an inference that Superior might have done so in 2012.

Even accepting that those two separate inferences—that Superior used chlorate in its 2012 job and that it trespassed on the Miller property in July 2013—were properly drawn from the evidence, to reach its verdict, the jury must then have stacked on top two further inferences—(1) inferring that because Superior used chlorate in 2012, the crew had with them large quantities of chlorate at the time of the 2013 trespass and (2) inferring that due to accident or intentional act, at least 60 pounds of dry chlorate were spilled and left on the Miller property. However, the stacking of inferences and speculation cannot be considered legally sufficient evidence. *See Pitzner*, 106 S.W.3d at 727-28; *Alarcon v. Alcolac Inc.*, 488 S.W.3d 813, 826 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Nor can suspicion and surmise substitute for evidence. *See Lozano v. Lozano*, 52 S.W.3d 141, 152 (Tex. 2001) (Phillips, C.J., concurring) ("suspicion and conjecture are not evidence"); *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex. 1993) ("while circumstantial evidence may be used to establish any material fact, we are not empowered to convert mere suspicion or surmise into some evidence"). In other words, "suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Pitzner*, 106 S.W.3d at 728 (cleaned up).

16

The trial court explained how it reached its decision to grant a JNOV, saying that there was no evidence that Superior entered the property, "used chlorate in any way," or possessed or added anything to its custom blend herbicide. Because there were too many evidentiary gaps, the court concluded, the evidence was too speculative to support the jury's verdict. In this difficult case, we have no choice but to agree. "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ridgway*, 135 S.W.3d at 601 (cleaned up). Moreover, evidence that is so slight that any inference is essentially a guess amounts to no evidence. *Id.* Even if it was proper to infer that Superior was responsible for an earlier use of chlorate on the Millers' property and that Superior trespassed on the Miller property on July 29, the Millers did not establish through direct or circumstantial evidence and *permissible* inferences reached from such evidence that: (1) the Superior crew had in its possession bags or some other large quantity of chlorate at the time of the trespass; and (2) while trespassing on the Miller property, a very large quantity of chlorate was either intentionally or accidentally spilled and left to work its way into the groundwater and soil until the cattle came across it two months later. Aside from the impermissible stacking of inferences, there simply was insufficient evidence to support those conclusions. *See Pitzner*, 106 S.W.3d at 728.

**Conclusion**

Based on this record, we cannot conclude that the trial court erred in granting a JNOV in favor of Superior. We affirm the trial court's final judgment.

_____

Cindy Olson Bourland, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed:   August 24, 2018